ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
KENNETH J. BLACK (291871)
SNEHEE KHANDESHI (342654)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com
skhandeshi@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PIOTR JASZCZYSZYN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SUNPOWER CORPORATION, et al.,<br><br>Defendants. | Case No. 3:22-cv-00956-AMO<br><br>CLASS ACTION<br><br>THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

**TABLE OF CONTENTS**


**Page**

I. INTRODUCTION ....1

II. BACKGROUND & OVERVIEW ....4

III. JURISDICTION AND VENUE ....13

IV. PARTIES TO THE ACTION ....14

V. ADDITIONAL CONTROL PARTIES ....15

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD ....16

A. Defendants' Materially False and Misleading Risk Warning Statements and Omissions for 2Q21 and 3Q21 ....16

B. Defendants' Materially False and Misleading Warranty Reserve Statements and Omissions for 2Q21 and 3Q21 ....19

C. Defendants' Materially False and Misleading Certification of Financial and Disclosure Controls for 2Q21 and 3Q21 ....23

D. Defendants' Materially False and Misleading Statements and Omissions About SunPower's Commercial Business ....25

VII. POST CLASS PERIOD EVENTS AND DISCLOSURES ....27

VIII. ADDITIONAL DISCLOSURE CONTROLS AND GAAP ALLEGATIONS, AND OTHER ALLEGATIONS SUPPORTING FALSITY AND SCIENTER ....39

A. SunPower's Admitted GAAP Violations and Material Weaknesses in Internal Controls, and Ineffective Disclosure Controls, Further Evidence Falsity and Support a Strong Inference of Scienter ....39

1. SunPower's GAAP Violations ....39

2. SunPower's Ineffective Controls ....42

B. SunPower's Restatements of SunPower's Financial Results During the Class Period Further Supports Falsity and Scienter ....47

C. The Exodus of SunPower Executives and its Auditor Further Supports a Strong Inference of Scienter ....49

IX. ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS ....50

X. ADDITIONAL ALLEGATIONS OF CONTROL PERSON LIABILITY ....58

XI. NO SAFE HARBOR ....61

**Page**

XII. APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE ....61

XIII. CLASS ACTION ALLEGATIONS ....62

XIV. PRAYER FOR RELIEF ....64

XV. JURY DEMAND ....65

## I. INTRODUCTION

1. Lead Plaintiff Steamfitters Local 449 Pension & Retirement Security Funds ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following, based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review of SunPower Corporation's ("SunPower" or the "Company") press releases, website, United States Securities and Exchange Commission ("SEC") filings, analyst reports, media reports and other publicly disclosed information about Defendants (as defined below). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2. This is a federal securities class action alleging violations of the anti-fraud provisions of the federal securities laws on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of SunPower during the period from August 3, 2021 through January 20, 2022, inclusive (the "Class Period"), and who suffered damages as a result of the conduct alleged herein. The action is brought against SunPower, Peter Faricy ("Faricy"), the Company's former Chief Executive Officer ("CEO"), President, and Chairman of the Company's Board of Directors, Manavendra S. Sial ("Defendants"), the Company's former Chief Financial Officer ("CFO") and Executive Vice President, and against the control defendants TotalEnergies SE ("TotalEnergies"), TotalEnergies Gaz & Electricité Holdings SAS ("TE Gaz"), and TotalEnergies Solar INTL SAS ("TE Solar," collectively, the Total Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

3. During the Class Period, Defendants violated §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, by making materially false and misleading statements and omissions concerning: (i) the risk that SunPower, a solar company, might or could experience defects or other quality issues in its products or product components, when those risks had already come to fruition; (ii) the Company's warranty reserves, which were required under Generally Accepted Accounting

Principles ("GAAP") to account for the defective products and associated costs of repair or replacement that affected nearly all of SunPower's commercial solar systems since 2019; (iii) the Company's financial and disclosure controls, which were necessary to provide reasonable assurance that the Company's financial condition and results were accurately reported to investors, but were in fact woefully inept as SunPower has now belatedly admitted; and (iv) the financial condition of the Company's commercial business, which unbeknownst to investors was plagued by defective products. In addition, the Total Defendants violated §20(a) of the Exchange Act as controlling persons for Defendants' primary violation of the Exchange Act.

4. Defendants deceived investors throughout the Class Period in a fraudulent scheme by concealing the existence and their knowledge of a product defect that affected nearly all of SunPower's commercial solar systems since 2019 at 1,000 or more sites. SunPower knew that its commercial business, including defective products, was a drag on the Company and prior to the Class Period took steps to try to unload it. The Company incurred due diligence costs beginning in 2Q21[1] and used 2Q21 financial results as the basis for the valuation of the business (*i.e.*, prior to July 4, 2021), in order to try to sell it. SunPower's controlling shareholder TotalEnergies (defined herein), a much larger company, which (through affiliates) had designated a majority of SunPower's board members, was part of that due diligence process, and agreed to take SunPower's flailing commercial business off its hands where it could be absorbed by the much larger company.

5. Defendants timed the announcement of the "advanced" stages of the sale of SunPower's commercial business with the Company's January 20, 2022 disclosure that SunPower's commercial business suffered from a defective product that had resulted in a "cracking issue" in factory-installed connectors supplied to SunPower. That cracking problem, in turn, required replacement or repair of the defective product for nearly all SunPower's commercial solar

[1] As used herein "Q" means SunPower's fiscal quarter and "FY" means SunPower's fiscal year. Specific quarters are designated by the quarter number followed by the letter Q, and the last two numbers of the fiscal year. Thus, 2Q21 indicates SunPower's second quarter in fiscal year 2021, which ran from April 5, 2021, to July 4, 2021. SunPower reports on a fiscal year that runs until the Sunday closest to the end of the applicable calendar year. Thus, FY21 means SunPower's fiscal year 2021, which ran from January 4, 2021, until January 2, 2022.

systems since 2019, at an initial admitted cost of $26.5 million[2], negatively impacting the Company's FY21 financial results (and costing SunPower millions of dollars more since FY21). On this news, the price of SunPower's stock plummeted nearly 17%, from $19.02 on January 20, 2022, to $15.80 on January 21, 2022.

6. Subsequently, investors would learn through a series of partial disclosures that not only had SunPower's commercial segment been afflicted by a defective product infecting nearly the entire commercial business but that the Company's financial results for FY20 and FY21 had been falsely reported and that Company's management had lied about the effectiveness of the Company's internal controls over financial reporting and disclosure controls. To that end, the Company admitted on November 1, 2023 and December 18, 2023 that SunPower's financial results for the periods FY20 through FY23 had not complied with GAAP as Defendants had previously assured investors, resulting in, *inter alia*, a restatement and downward adjustment of both Adjusted EBITDA and net income (loss) by $9.3 million, a staggering 19.8% and 19.7%, respectively. As explained below, this was an admission that SunPower's financial results, reported during the Class Period, were materially false because under GAAP a restatement can only be made based upon information that existed at the time the financial statements were prepared.

7. Perhaps even more astonishing, SunPower has now admitted, in a series of disclosures between October 2023 and April 2024, that the disclosures and financial controls that Defendants attested were effective and provided reasonable assurance to investors that they could rely on Defendants' representations and the Company's financial results were woefully inept for years. SunPower's belated December 18, 2023 restatement reflects this admission. But, it has come to light that the restatement did not go far enough to correct falsehoods that Defendants told investors for over three years – before, during, and after the Class Period. On April 23, 2024,

---

2 The ~$26.5 million for 4Q21 was announced by SunPower in January and February 2022. The Company would later, in its annual report for FY22 (filed March 10, 2023 on Form 10-K), revise this figure for 4Q21 without explanation. And more recently, on April 23, 2024, the Company notified investors not to rely on its financial reports.

SunPower admitted that its first restatement can no longer be relied on and that it would be required to take the highly unusual step of issuing a second restatement to further correct misstatements in its prior financial results. Then, on July 3 and 12, 2024, SunPower disclosed that senior management misconduct (*i.e.*, Faricy and Sial) had been concealed not only from investors but from the Company's own auditors, Ernst & Young LLP ("EY"), resulting in EY abruptly resigning, as it could no longer be associated with the Company's financial results. At least one analyst characterized these disclosures as "shockingly bad."

8. Defendants are now gone from SunPower under suspicious circumstances – Faricy left on February 26, 2024, days before the SEC issued on February 28, 2024 a formal subpoena as part of its investigation into SunPower – as are other executives and board members. The Company too is essentially gone, having filed for bankruptcy on August 5, 2024 and its stock is essentially worthless.

## II. BACKGROUND & OVERVIEW

9. SunPower described itself as a solar energy company that delivered complete solar solutions to customers primarily in the United States and Canada. The Company's securities traded on the NASDAQ since 2005 under the symbol "SPWR." In 2011, SunPower became a majority-owned subsidiary of TotalEnergies.

10. The Company generated revenue primarily from the sale of solar energy generation, storage, and use products and services in what is called the downstream "Distributed Generation" or "DG" residential (often referred to as "resi") and commercial markets. SunPower, which in 2020 divested its manufacturing business, relied on key technology and components from a limited number of third-party suppliers to incorporate into the hardware it sold (or leased) to its customers.

11. At the start of the Class Period, the Company divided its business into three main segments: Residential, Light Commercial ("RLC"); Commercial and Industrial Solutions (either "CIS" or "C&I," sometimes described as the large or heavy commercial portion of the business); and "Others." SunPower, and the financial analysts that followed the Company, frequently referred to the "light commercial" portion of SunPower's RLC business as "Light Commercial

Value-Added Reseller" or "CVAR." For the fiscal year ended January 3, 2021, the Company reported approximately $255 million (~23%) in revenue from CIS.

12. SunPower emphasized the quality of its products to investors and customers, including the quality of its commercial solar products. For example, the Company asserted on its website just two days into the Class Period, August 5, 2021, that SunPower offered the solar industry's strongest warranty for commercial solar systems: "Solar warranties mitigate the risk of faulty equipment, breakage and/or underperformance that might occur." Further that: "SunPower covers 100% of repair or replacement costs, while conventional solar warranties don't.* From labor to shipping to parts – we've got you[] covered for 25 years." Wells Fargo emphasized this message in a June 29, 2022 analyst report: "SunPower has historically differentiated its offering based on hardware (Maxeon panels and Enphase micro-inverters), commercial leadership (voted top provider), and an integrated warranty contract that covers all components (panels, inverters, batteries)."

13. SunPower's commercial business relied on Tigo Energy, Inc. ("Tigo") as a key supplier for the component parts used in its purportedly quality products sold to commercial customers, as reflected in a July 26, 2024 complaint for breach of contract filed by SunPower against Tigo.[3] The parties' agreement was governed by a February 2019 Master Supply Agreement with specifications indicating a December 31, 2020 expiration date.

14. SunPower represents in the Tigo Complaint that the connectors used in the more than 200,000 "MLSDs" sold to SunPower for use in "commercial solar installations" resulted in "***connector cracking" because Tigo "over-torqued the screw nut such that it became flush with the connector body***." This "was utilized on ***most*** of the MLSDs Tigo supplied to SunPower."

15. Defendants knew of the defective Tigo products years before filing the Tigo Complaint. For example, on April 19, 2021, Faricy became CEO, President, and a member of SunPower's Board of Directors. He assured investors in his first two conference calls with analysts

[3] The complaint was filed in the Superior Court of California, County of Santa Clara, and is captioned *SunPower Corp. v. Tigo Energy, Inc.*, 24-cv-443972 (Cal. Sup. Ct. Santa Clara Cnty.) ("Tigo Complaint").

and investors in May 2021 that he would be "diving deep" into SunPower's residential and commercial business segments over the next 100 days (*i.e.*, by August 21, 2021):

- [5/5/21 call:] "My focus over the next ***100 days*** will center around ***diving deep*** into the residential and commercial, and industrial businesses."
- [5/13/21 call:] "In the near term, my focus over the next ***100 days*** will center around diving deep into the residential, commercial and industrial businesses."

16. Thereafter Faricy, Sial, and SunPower agreed to take the Company in a new strategic direction; they would sell off and wind down SunPower's commercial business, to focus on rapidly expanding the Company's residential business. As one analyst would later write on February 10, 2022: "SPWR has spoken to divestment [of the CIS business] ***through much of 2021***." As such, prior to the Class Period SunPower began the process that resulted in the divestment of the CIS business in a controlled transaction to SunPower's majority owner, TotalEnergies.

17. The due diligence process to divest the CIS business started prior to the Class Period. As reflected in a complaint filed by an investor against SunPower and TotalEnergies, TotalEnergies and SunPower began discussing the sale of the CIS business in February 2021, a process codenamed "Project Odyssey."[4] Shortly thereafter, SunPower and TotalEnergies worked to value the business and conduct due diligence, with Marathon Capital LLC hired to act as a financial advisor. By April 28, 2021 the purportedly independent SunPower board members were informed that TotalEnergies' "proposed valuation [for the CIS business] was likely in the $50m to $100m range." According to the TotalEnergies Complaint, by May 11, 2021, Faricy was involved in the process and SunPower agreed to give TotalEnergies a right of first refusal for the sale of the CIS business. By mid-July 2021, SunPower had received seven bids from various entities.

18. In addition, the Equity Purchase Agreement eventually reached between SunPower and TotalEnergies for the sale of the CIS business reflects that the financial results used to

---

[4] The complaint was publicly filed in the District of Delaware on September 25, 2023 and is captioned *Edelman v. TotalEnergies SE*, Case No. 2023-0136 (D. Del.) ("TotalEnergies Complaint").

determine the purchase price were dated as of July 4, 2021 (*i.e.*, the first two quarters of SunPower's FY21). The agreement also referred to an "Odyssey Financial Model" – a model used to value the CIS business. The agreement specifically referred to a "Project Odyssey Phase II Financial Model 2021-09-21 vF," which indicates that a financial model existed and was used in the due diligence process prior to September 21, 2021, and that the financials used for the model were from 2Q21, because SunPower's 3Q21 had not ended. This is consistent with the TotalEnergies Complaint's allegation that seven bids had been received by mid-July 2021. The agreement also revealed that during the due diligence process SunPower admitted that its historical financial statements (as of 2Q21) had exceptions set forth in a non-public schedule. The schedule purported to identify instances where SunPower's financials did not "fairly present in all material respects the financial condition and financial results of the Business" and/or were not "prepared in accordance with GAAP."

19. Consistent with the July 4, 2021 reference date described above, SunPower disclosed in its quarterly report for 3Q22 that the Company began incurring transaction costs "***in the second quarter of fiscal 2021***," *i.e.*, April 6, 2021 through July 4, 2021, in connection with the sale of the CIS business to TotalEnergies.

20. In turn, SunPower's agreement with Tigo provided that SunPower agreed to a control plan to ensure the quality of Tigo's products, including testing, and further that SunPower had inspection rights regarding the manufacturing of the Tigo products. In addition, the warranty that Tigo provided for its products required SunPower to register for monitoring within 90 days of the installation date. Thus, during the due diligence process for divestment of the CIS business and consistent with the operation of the agreement, Defendants would have been alerted to Tigo's defective product. Indeed, as one analyst concluded on January 21, 2022, "[o]ur sense is this [product defect] issue needs to be resolved . . . and ***likely came up in due diligence***."

21. Further, as reflected in SunPower's manual for Safety and Installation Instructions for the United States and Canada, published on its website on December 7, 2021, SunPower added new language concerning cracking in connectors not present in its 2019 or 2020 editions of the manual. Notably, it newly warned that "[c]onnectors are factory assembled with intentional gaps

between the cable nut and the body of the connector. ***Do not retighten module connector nuts*** as this ***may lead to stress cracking of the connector*** assembly and will void the warranty." SunPower, in the Tigo Complaint, represents that the same issue resulted in cracking of connectors.

22. With this background, Defendants concealed the cracking problem associated with Tigo's defective products during the Class Period beginning on August 3, 2021 when SunPower reported its quarterly financial results, by failing to disclose the defect or the resulting cracking connector problem when speaking on the state of the commercial business, and by failing to account for the financial consequences of the defective product. Instead, Defendants, in SunPower's 2Q and 3Q FY21 quarterly financial statements – statements Defendants have now admitted were false and issued pursuant to disclosure controls and internal controls over financial reporting that were inadequate and not effective – purported to warn that product defects, which could have an adverse impact on SunPower, ***might*** occur, when they had already occurred.

23. SunPower further concealed the financial impact of the cracking problem associated with Tigo's defective products by failing to maintain warranty reserves and properly report costs associated with the defective Tigo products and the cracking it caused. As explained herein (§VIII.A.1.), GAAP required SunPower to account for and disclose the defective products by disclosing the nature of the loss contingency associated with the cracking problem and (i) accruing a reasonable estimate for the probable loss or (ii) disclosing the estimated possible loss or range of loss or a statement that such an estimate could not be made. And as reflected in a June 4, 2020 response letter to the SEC who had flagged SunPower's warranty reserves as potentially problematic, Sial represented to the SEC that SunPower's reserves included ***estimated costs for claims that "could" be brought "irrespective of whether a claim was received or not***." Thus, SunPower was required to take warranty reserves for defective products prior to customers filing warranty claims when the issue came to their attention. Defendants, however, materially misled investors by representing that SunPower had taken proper reserves in accordance with GAAP and the Company's own stated policy, when SunPower in fact failed to take adequate reserves.

24. The failure to properly accrue for the costs associated with the warranty reserves falls directly on SunPower's senior management, Sial and Faricy. SunPower told investors prior

to the Class Period in its annual financial report for FY20 that it "***continuously monitor[ed]" for potential risks and warranty-related costs***, while falsely assuring them it properly maintained reserves. In addition, in SunPower's annual reports for FY20 and FY21, filed on Forms 10-K, the Company's auditor EY identified SunPower's recording of contingent liabilities for warranty reserves as a "Critical Audit Matter" and that the reported liabilities were based on ***"management's projection of future failure rates and expected product repair or replacement costs."***

25. Not until January 20, 2022, did SunPower issue a release that preannounced that it would miss its earnings guidance for 4Q21 and FY21 and expected approximately $27 million of supplier-quality related charges in 4Q21 and approximately $4 million[5] in 1Q22 due to "cracking" problems in products across its commercial business segments:

> SAN JOSE, Calif. (January 20, 2022) – SunPower Corp. (NASDAQ:SPWR), a leading solar technology and energy services provider, today announced it is taking proactive measures to enhance customer care by replacing certain third-party connectors within its Light Commercial Value-Added Reseller (CVAR) and Commercial & Industrial Solutions (CIS) systems.
>
> Through a product quality assessment, the company has ***identified a cracking issue that developed over time*** in certain factory-installed connectors within third-party commercial equipment supplied to SunPower. There have been no reported safety incidents attributed to this issue, nor has there been any degradation of performance. Nevertheless, to avoid potential longer-term complications and ensure an excellent lifetime customer experience, SunPower is proactively replacing all of these connectors. The company plans to replace the connectors in impacted equipment largely during 2022. . . .
>
> ***SunPower expects approximately $27 million of supplier-quality related charges*** in fourth quarter 2021 and approximately $4 million in the first quarter of 2022 as it pursues recovery of costs from the suppliers. . . .
>
> GAAP Revenue for fourth quarter 2021 is expected to fall within the previously guided range of $361 to $421 million. Excluding the charge, fourth quarter adjusted ***EBITDA results are expected to be at the low end of SunPower's previously disclosed guidance range of $18 to $41 million***. Factors affecting fourth quarter adjusted EBITDA include approximately $6.5 million of Residential EBITDA effectively pushed into 2022 as the result of weather in California and COVID impacts. Another $3 million was invested in sales and marketing to rapidly

---

[5] SunPower would later report, in its annual report for FY21, that the charge taken was $26.5 million for 4Q21 and $3.5 million for 1Q22. The Company likely rounded up in its January 20, 2022 release.

> expand SunPower's serviceable solar market to more customers in underpenetrated areas nationally.
>
> * * *
>
> SunPower also announced the appointment of Derek Kuzak as Executive Vice President for Supply Chain, Quality, and Field Operations.
>
> * * *
>
> As previously announced, SunPower is pursuing a sale of its CIS business as part of its growing focus on and investment in its high-growth residential business. SunPower remains in ***advanced discussions*** for the sale of CIS and expects to finalize an agreement within weeks. No final agreement has been reached and there can be no assurances that any transaction will result.

26. Following SunPower's January 20, 2022 preannouncement, financial analysts were quick to report on the scope and timing of the problem. "[N]early all" of SunPower's commercial solar systems were affected, which would cost an estimated $31 million and require replacement throughout 2022. Importantly, analysts reported that Defendants must have learned about the pervasive problem of cracking in third-party components in conducting due diligence pursuant to selling the CIS business segment, if not earlier. At least one analyst also reported that the cracking problem affected approximately 1,000 or more sites and affected components in products that had been in use with customers "since 2019." For example:

- January 21, 2022, Roth Capital Partners report:

> After market hours on 1/20, SPWR preannounced Q4'21 results to the downside and detailed the company's expectations for (1) charges of ~$31mn (~$27mn in Q4'21 and ~$4mn in Q1'22) related to the proactive replacement of third-party connectors experiencing a "cracking issue" ***for nearly all C&I systems since 2019***. . . .
>
> **Overall thoughts**. Given the overall negative sentiment in the sector, look for the stock to be weak. . . . ***We believe SPWR may need to retrofit ~1,000+ sites representing close to ~9MW (our guesstimate)***.
>
> **Downside Q4'21 preannouncement**. SPWR reiterated its prior Q4'21 revenue guidance of $361-421mn, but noted that Q4'21 adjusted EBITDA is expected to be at the low end of the previous guidance of $18-41mn. Management attributed the lowered outlook for adjusted EBITDA to (1) $6.5mn of resi EBITDA effectively pushed into 2022 due to weather in California and Covid impacts and (2) an additional $3mn invested in sales and marketing in Q4'21 to expand in "underpenetrated areas nationally."

- January 20, 2022, Truist Securities report:

> **SPWR Addressing 3P Quality Concerns**. . . . SPWR has identified a cracking issue in certain connectors within third party commercial equipment supplied to the company. . . . ***As the company is pursuing the sale of its CIS business, we wouldn't be surprised if such findings were revealed in a due diligence process, though we note SPWR specifically indicated the issue was identified in a product quality assessment***.

- January 21, 2022, Cowen Equity Research report:

> SunPower disclosed a quality issue with some of its commercial equipment. The company noted that a third party connector that was installed at the factory has developed cracking issue. . . . ***Our sense is this issue needs to be resolved before the intended sale of the C&I division occurs and likely came up in due diligence***.

27. As a result of Defendants' materially false and misleading representations and omissions, the Company's stock price traded at artificially inflated prices as high as $34.61 on November 1, 2021. But when the true facts concerning SunPower's need to take millions of dollars in charges to repair and replace cracked connectors in nearly all of its commercial solar systems, and the impact to SunPower's earnings, became known on (in the aftermarket of) January 20, 2022, SunPower's stock price fell 16.9%, from a close of $19.02 on January 20, 2022, to $15.80 on January 21, 2022, on more than 11.4 million shares trading volume as compared to only 2.8 million shares traded on January 20, 2022. The prices of SunPower's securities, however, remained artificially inflated because the Company had not disclosed the magnitude or impact of the defective product plaguing its commercial business during the Class Period.

28. Following the Class Period, SunPower would further reveal the magnitude of Defendants' misconduct. For example, SunPower has disclosed that the problem exceeded what it initially reported. To date, SunPower has taken at least $32.3 million in warranty reserve charges for the CIS business, including to indemnify TotalEnergies after the sale of the CIS business.

29. SunPower also belatedly admitted that it lacked proper disclosure controls and internal controls over financial reporting and failed to accurately report its financial results, including those issued during the Class Period. For example, on November 1, 2023, SunPower issued a summary of its restated financial results, including its FY20 and FY21 financial results.[6]

---

[6] SunPower's FY20 financial results were included, in part, and incorporated by reference, in its Class Period quarterly filings on Forms 10-Q for 1Q21 and 2Q21.

Subsequently, on December 18, 2023, SunPower filed with SEC its first restatement of the Company's financial results for the FY20 through 3Q23, and admitted that SunPower lacked effective financial and disclosure controls for that same period.

30. The bad news kept coming. On February 27, 2024, SunPower announced Faricy's abrupt departure. Unbeknownst to investors (until July 3, 2024), the next day, February 28, 2024, "the SEC issued a document subpoena to the Company, which relates to certain accounting matters, including aspects of the Company's revenue recognition practices, with a focus on the periods covered by the [restatements]."

31. Then, on April 23, 2024, SunPower announced that investors should not rely on its first restatement, and intended to file a second restatement.

32. On July 3, 2024, SunPower filed with the SEC on Form 8-K a release announcing that its auditor, EY, had taken the highly unusual step of resigning due to "***misconduct by senior members of management, who had significant roles in internal control over financial reporting*** and upon whose representations EY relied." The senior members of management included Faricy and Sial.

33. On July 12, 2024, in a letter SunPower filed with the SEC, EY explained that the reasons why it resigned were far worse than SunPower had characterized them. EY had told SunPower that the Company was required to disclose alleged management misconduct to EY but had not done so. EY subsequently learned of additional alleged misconduct by former, senior members of management that the Company concealed from EY despite EY's earlier directive that such misconduct must be disclosed to EY regardless of its nature.

34. On July 15, 2024, TipRanks reported that a GLJ Research analyst reported that "SunPower on Friday issued one of the most 'shockingly bad' regulatory disclosures the firm has seen." It went on to indicate that the "filing provided additional information from [EY] regarding its resignation of auditor, with EY calling out new SunPower management for misrepresenting the reason it resigned . . . . EY writes that SunPower continues to cover up various allegations against current and former management that impeded its ability to provide a clean audit of the Company's books."

35. Days later, on July 19, 2024, a Guggenheim analyst reported "we believe that SPWR's equity no longer has any value, and our price target is now $0, down from $1."

36. In the weeks to come, SunPower would cease operations, culminating in the Company filing for bankruptcy on August 5, 2024, and with the Company set to be delisted from NASDAQ on August 16, 2024 (as NASDAQ informed SunPower on August 7, 2024).

37. For the reasons described herein, SunPower's stock price climbed to a Class Period high of $34.61 on November 1, 2021, but has since plummeted and is now essentially worthless.

## III. JURISDICTION AND VENUE

38. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

39. Jurisdiction is conferred by 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

40. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act, 15 U.S.C. §78aa.

41. SunPower is headquartered at 1414 Harbour Way South, Suite 1901, Richmond, California 94804 (SunPower was previously headquartered at 51 Rio Robles, San Jose, California 95134). Certain of the acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this district. There is also personal jurisdiction over the Total Defendants because they purposefully availed themselves of the laws of the United States and California by virtue of, *inter alia*: (i) establishing a sponsored ADR that trades on the NYSE and filing annual reports with the SEC on Forms 20-F, including the reporting of metrics reflecting SunPower's operations (a company with its headquarters in Richmond, California); (ii) targeting the United States to expand strategic energy investments, including through ownership of SunPower; and (iii) through the Total Defendants' participation in the process which resulted in the Total Defendants' acquisition of SunPower's CIS business in a controlled transaction.

42. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES TO THE ACTION

43. Plaintiff purchased the publicly traded securities of SunPower during the Class Period and was damaged as a result of Defendants' wrongdoing as alleged in this complaint as set forth in its certification previously filed with the Court on April 18, 2022. ECF 25-4.

44. SunPower is a solar energy company incorporated under the laws of Delaware and headquartered in San Jose, CA. SunPower common stock was listed and traded on the NASDAQ, an efficient market, under the ticker symbol "SPWR." As of February 18, 2022, the Company had 173,115,964 shares issued and outstanding. During the Class Period, SunPower was a majority-owned subsidiary of TotalEnergies (defined below). ECF 15. On August 5, 2024, SunPower filed for bankruptcy. It is understood that the action against SunPower is stayed pursuant to the automatic stay provisions of 11 U.S.C. §362.

45. Faricy was CEO and President of SunPower. At the start of the Class Period Faricy was a Director on SunPower's Board of Directors and, on November 1, 2021, he became Chairman of the Board of Directors. On February 27, 2024, SunPower announced that Faricy had resigned without a replacement.

46. Manavendra S. Sial was SunPower's CFO and Executive Vice President of SunPower. Sial was hired on May 2, 2018, and resigned on August 26, 2022.

47. As officers and/or directors and controlling persons of a publicly held company whose common stock is traded on the NASDAQ and governed by the provisions of the federal securities laws, Faricy and Sial had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, disclosure controls, and present and future business prospects; not to make material misrepresentations with respect thereto or to omit material facts necessary to make the statements contained therein not misleading; and to correct any previously issued statements that had become materially misleading or untrue so that the market price of the Company's securities would be based upon truthful and accurate

information. The Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

48. Faricy and Sial participated in the drafting, preparation, and/or approval of the various public shareholder and investor reports, and other communications complained of herein, and were aware of, or deliberately disregarded, the misstatements contained therein and omissions therefrom and their materially false and misleading nature. Because of their membership(s) on SunPower's Board of Directors and/or executive and managerial positions within SunPower, the Defendants had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein, and knew (or deliberately disregarded), that these adverse facts rendered the positive representations made by or about SunPower and its business, or adopted by the Company, materially false and misleading.

## V. ADDITIONAL CONTROL PARTIES

49. TotalEnergies SE ("TotalEnergies") is a multinational energy and petroleum company. The company maintains its headquarters in Courbevoie, France and is a *societas europaea* organized under the laws of the Republic of France. According to its website, it has been active in the U.S. for over 60 years. During the Class Period, TotalEnergies, together with its affiliates TotalEnergies Gaz and TotalEnergies Solar (defined below), were each a majority beneficial owner of SunPower common stock. As SunPower reported on Schedules 13 D/A, for example on May 25, 2022, "TotalEnergies Solar is a direct wholly owned subsidiary of TotalEnergies Gaz, which is an indirect wholly owned subsidiary of TotalEnergies. As a result, each of TotalEnergies Solar, TotalEnergies Gaz and TotalEnergies may be deemed to beneficially own the [SunPower] Shares." To that end, TotalEnergies trades its American Depositary Receipts ("ADRs") on the New York Stock Exchange in a sponsored ADR program under the ticker "TTE," and maintains information regarding its ADRs trading in New York on its website. TotalEnergies also files with the SEC its annual report on Form 20-F, a requirement for its ADR offering, which included at relevant times TotalEnergies's consolidated statement of income and its reporting of contingency reserves on SunPower's solar panel warranties. TotalEnergies targeted the United States to expand its solar energy enterprises, including with the purchase of SunPower's CIS

business. On February 10, 2022, TotalEnergies issued a press release titled, "United States: TotalEnergies to Acquire SunPower's Commercial & Industrial Solar Business." The press release specifically identified "TotalEnergies (NYSE: TTE)" as the purchaser of the CIS business, and quoted Vincent Stoquart, who both served as designee on SunPower's board and as a senior vice president of TotalEnergies, as saying the deal was "enabling TotalEnergies to expand reach in the U.S. B2B solar distributed generation."

50. TotalEnergies Gaz & Electricité Holdings SAS ("TE Gaz") was founded in 1995 and is an investment holding company. It is a wholly-owned and controlled subsidiary of TotalEnergies. TE Gaz lists its business address in Courbevoive, France, the same address as TotalEnergies, and is a *société par actions simplifiée* organized under the laws of the Republic of France.

51. TotalEnergies Solar INTL SAS ("TE Solar"), formerly known as Total Gas & Power USA SAS, is a wholly-owned and controlled subsidiary of TE Gaz, and a subsidiary of TotalEnergies. TE Solar is listed at the same address as TE Gaz and TotalEnergies on SunPower's proxy statement filed with the SEC on April 1, 2022, and is a *société par actions simplifiée* organized under the laws of the Republic of France. TE Solar had the ability to and did appoint a majority of SunPower's board of directors, six of the total eleven.

52. TotalEnergies, TE Gaz and TE Solar entered into an affiliation agreement (as amended since 2011) with SunPower. TE Solar also entered into a strategic cooperation agreement with SunPower in December 2020 that related to the sale of certain commercial projects. Further, as described herein, in 2021 and 2022 TotalEnergies was involved in, negotiated, and completed the purchase of the CIS business from SunPower.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

### A. Defendants' Materially False and Misleading Risk Warning Statements and Omissions for 2Q21 and 3Q21

53. SunPower's 2Q21 and 3Q21 quarterly reports filed with the SEC on Forms 10-Q on August 4, 2021 and November 4, 2021, respectively, contained materially false and misleading

risk disclosures warning of risks that had already materialized and omitting material adverse information:

(a) False and Misleading Statement:[7] "***The failure of a supplier to supply . . . components that meet our quality, quantity, and cost requirements, could impair our ability to manufacture our products or could increase our cost of production***." (##1-2).

(b) False and Misleading Statement: "***[D]efects could cause us to incur significant warranty, non-warranty, and re-engineering costs***. . . ." (##3-4).

(c) False and Misleading Statement: "***[W]e may be responsible for repairing or replacing defective parts during our warranty period, often including those covered by manufacturers' warranties, or incur other non-warranty costs***." (##5-6).

(d) False and Misleading Statement: "***[P]otential future product or component failures could cause us to incur substantial expense to repair or replace defective products or components***. . . ." (##7-8).

(e) False and Misleading Statement: "***Repair and replacement costs, as well as successful indemnification claims, could materially and negatively impact our financial condition . . . and results of operations***." (##9-10).

(f) False and Misleading Statement: "***[Q]uality issues . . . could adversely affect our business, results of operations, . . . and financial condition***." (##11-12).

54. Reasons Why the Above Statements Were False and Misleading: Each of the above statements (¶53) concerning the risk of product defects were materially false and misleading as Defendants knew or deliberately disregarded and failed to disclose material adverse information, as reflected, *inter alia*, by the following facts:

(a) Quality issues with SunPower's commercial products were widespread. SunPower represented in the Tigo Complaint that a defect in "most" of the more than 200,000 MLSDs SunPower purchased from Tigo occurred during installation, pursuant to a February 2019

---

[7] All statements and omissions alleged herein to violate the Exchange Act are preceded by "False and Misleading [] Statement:" and followed by each statement, and set forth in Appendix A, attached hereto, in their entirety. All "#" references herein are to Appendix A.

agreement with a December 31, 2020 expiration date. Through its agreement with Tigo, SunPower had testing and inspection rights of the Tigo products that were defective according to SunPower because they were over-torqued and flush with the connector body (¶¶14, 20);

(b) The defective Tigo products caused widespread cracking and the risk of cracking (*i.e.*, the cracking problem) in SunPower's products. Analysts confirm that "nearly all" of SunPower's commercial solar systems needed to be repaired or replaced, impacting more than 1,000 sites. (¶26). As a result of this widespread problem, the Company was forced to later admit that at least $32.3 million in charges was required to address the cracking problem (¶124). The magnitude and timing of SunPower's warranty reserve charges indicate that Defendants were aware of, or deliberately disregarded, the cracking problem;

(c) The pervasive cracking problem would have been discovered during the due diligence process to sell the CIS business, which started before the Class Period. As detailed herein, SunPower: (i) started discussing with TotalEnergies the sale of the CIS business – codenamed "Project Odyssey" – in February of 2021; (ii) received seven bids for the CIS business as of mid-July 2021; (iii) incurred transaction costs for the sale of the CIS business in 2Q21 (April 6, 2021 through July 4, 2021); (iv) used July 4, 2021, as the cutoff date for providing historical financial results to value the CIS business; and (v) used a Phase II financial model, dated September 21, 2021 (before 3Q21 financial results were available), confirming that SunPower used 2Q21 to value the business (¶¶17-19);

(d) Defendants' focus on the CIS business would have revealed the pervasive cracking problem. To that end: (i) Defendants "spoke[] to" and were heavily involved in selling the CIS business "through much of 2021" (*see* ¶¶16, 26); (ii) by May of 2021, Faricy was directly involved in the process of selling the CIS business and was speaking to TotalEnergies' representatives regarding the process (¶17); and (iii) Faricy completed his 100 day deep dive into the commercial business by mid-August 2021 (¶15);

(e) Defendants made representations to customers that imply their knowledge of the cracking problem at the time of their misrepresentations. To that end: (i) in a sign that commercial customers were already experiencing cracking problems, on August 5, 2021,

Defendants reassured commercial customers, specifically, that SunPower's warranties "mitigate the risk of faulty equipment, breakage . . . ." and other "defects" (¶12); and (ii) on December 7, 2021, SunPower, for the first time in over a year, updated a safety manual on its website to newly warn its connectors faced a risk of cracking, including from over-tightening, the same defect SunPower alleged in the Tigo Complaint (¶21); and

(f) The Risk Warning Statements were issued at a time when SunPower has admitted that it had a material weakness in financial controls and ineffective disclosure controls (§VIII.A.2.).

**B. Defendants' Materially False and Misleading Warranty Reserve Statements and Omissions for 2Q21 and 3Q21**

55. False and Misleading Warranty Reserve Statements: SunPower's quarterly reports for 2Q21 and 3Q21 filed on Forms 10-Q, on August 4, 2021 and November 4, 2021, incorporated by reference the Company's "Summary of Selected Significant Accounting Policies," which, under "Product Warranties," contained the following false and misleading representation:

> ***We maintain reserves to cover the expected costs that could result from these warranties***. Our expected costs are generally in the form of product replacement or repair. Warranty reserves are based on our best estimate of such costs and are recognized as a cost of revenue. ***We*** continuously monitor product returns for warranty failures and ***maintain a reserve for the related warranty expenses*** based on various factors including historical warranty claims, results of accelerated lab testing, field monitoring, vendor reliability estimates, and data on industry averages for similar products. ##13-14.

56. SunPower's quarterly report for 2Q21 on Form 10-Q contained the following materially false and misleading statements:

(a) False and Misleading August Warranty Accruals Statement: "***Accruals for warranties issued during the period" of "$2,378,000***" for 2Q21 (#15);

(b) False and Misleading August Short-Term Warranty Reserves Statement: "***Short-term warranty reserves" of "$21,017,000***" as of July 4, 2021 (#16); and

(c) False and Misleading August Long-Term Warranty Reserves Statement: "***Long-term warranty reserves" of "$45,768,000***" as of July 4, 2021 (#17).

57. SunPower's quarterly report for 3Q21 on Form 10-Q contained the following materially false and misleading statements:

(a) False and Misleading November Warranty Accruals Statement: "***Accruals for warranties issued during the period" of "$3,791,000***" for 3Q21 (#18);

(b) False and Misleading November Short-Term Warranty Reserves Statement: "***Short-term warranty reserves" of "$21,641,000***" as of October 3, 2021 (#19); and

(c) False and Misleading November Long-Term Warranty Reserves Statement: "***Long-term warranty reserves" of "$43,014,000***" as of October 3, 2021 (#20).

58. False and Misleading August EBITDA Statements: In: (i) an August 3, 2021, SunPower Form 8-K filed with the SEC, with an accompanying release; and (ii) a slide deck accompanying SunPower's August 3, 2021, quarterly earnings call hosted by Faricy and Sial, Defendants falsely reported "***Adjusted EBITDA" of "$22.2" million*** (or its equivalent) for 2Q21, for the period ended July 4, 2021. ##21-22.

59. False and Misleading August Income Statements: In: (i) an August 3, 2021, SunPower Form 8-K filed with the SEC, with an accompanying release; (ii) a slide deck accompanying SunPower's August 3, 2021, quarterly earnings call hosted by Faricy and Sial; and (iii) an August 4, 2021 quarterly report on Form 10-Q filed the SEC, Defendants falsely reported "***GAAP net income (loss) from continuing operations" of "$75.2" million*** for 2Q21, for the period ended July 4, 2021. ##23-25.

60. False and Misleading November EBITDA Statements: In: (i) an November 3, 2021, SunPower Form 8-K filed with the SEC, with an accompanying release; and (ii) a slide deck accompanying SunPower's November 3, 2021, quarterly earnings call hosted by Faricy and Sial, Defendants falsely reported "***Adjusted EBITDA" of "$17.5" million*** (or its equivalent) for 3Q21, for the period ended October 3, 2021. ##26-27.

61. False and Misleading November Income Statements: In: (i) an November 3, 2021, SunPower Form 8-K filed with the SEC, with an accompanying release; (ii) a slide deck accompanying SunPower's November 3, 2021, quarterly earnings call hosted by Faricy and Sial; and (iii) an November 4, 2021 quarterly report on Form 10-Q filed the SEC, Defendants falsely reported "***GAAP net income (loss) from continuing operations***" ***of "$(84.4)" million*** (or its equivalent) for 3Q21, for the period ended October 3, 2021. ##28-30.

62. Reasons Why the Above Statements Were False and Misleading: Each of the above statements (¶¶55-61) concerning the Company's warranty reserves and earnings results were materially false and misleading as Defendants knew or deliberately disregarded and failed to disclose material adverse information, as reflected, *inter alia*, by the following facts:

(a) GAAP, which Defendants claimed SunPower complied with, required SunPower to disclose the defective products and resulting cracking problem by disclosing the nature of the loss contingency associated with the cracking problem. GAAP required Defendants to: (i) accrue a reasonable estimate for the probable loss; or (ii) disclose the estimated possible loss or range of loss or a statement that such an estimate could not be made.[8] §VIII.A.1. Sial also represented to the SEC in a June 4, 2020 letter, that SunPower's reserves included estimated costs for claims that "could" be brought "irrespective of whether a claim was received or not" (¶23);

(b) As a result of the prevalence and magnitude of the product defect and the cracking problem, described above (¶54(a)-(b)), Defendants had a reasonable basis to estimate the warranty reserves for the cracking problem but failed to do so. *See* ¶¶118-124. If for any reason Defendants could not reasonably estimate the loss, GAAP still required SunPower to disclose the nature of the loss contingency associated with the cracking problem and an estimated range of loss, or provide a statement that such an estimate could not be made, but Defendants failed to do either, and, as a result, SunPower's reported financial results did not comply with GAAP (*id.*);

(c) The magnitude of Defendants' failure to properly disclose or accrue for the warranty reserves as required by GAAP, to the tune of at least $32.3 million, further indicates the falsity of the above statements (¶124);

(d) The failure to properly estimate warranty reserves or to disclose SunPower's inability to do so, and the material weakness in internal controls over financial reporting, is attributable to Defendants. For example, EY identified warranty reserves as a "Critical Audit Matter" in SunPower's financial FY20 and FY21 Forms 10-K, and indicated that

[8] Financial Accounting Standards Board, Accounting Standards Codification ("ASC") 450, Contingencies.

the reserves relied on "management's projection of future failure rates and expected product repair or replacement costs" (*see* ¶¶24, 131-134);

(e) By virtue of SunPower's November 1, 2023 summary of restatement changes, and December 18, 2023 restatement, filed on Form 10-K/A, the Company has admitted that Defendants falsely reported Adjusted EBITDA and net losses for FY21 by $9.3 million, or by 19.8% and 19.7%, respectively. ¶6; *see also* ¶85.[9] Defendants have also admitted that warranty-related costs negatively impacted the Company's earnings, including as measured by Adjusted EBITDA and net income (loss). *E.g.*, ¶¶72, 97. While SunPower did not directly explain that the restated financial results were tied to warranty costs, in its first restatement it admitted that it did not properly account for Adjusted EBITDA and net losses. SunPower subsequently has admitted that the first restatement was materially inaccurate and that a second restatement would be forthcoming. ¶¶31, 100. The inference is that SunPower will (or would have) further restate(d) Adjusted EBITDA and net loss. It can be inferred from the: (i) negative impact of increased warranty reserves on EBITDA and net losses as a result of the cracking problem; (ii) admitted falsity of SunPower's FY21 financial results; (iii) need for a second restatement; and (iv) requirements of GAAP (*see* §VIII.A.1.), that SunPower failed to properly account for the massive warranty-related costs associated with the cracking problem during the Class Period (¶¶115-116, 123-124);

(f) As discussed herein, SunPower has admitted that its internal controls over financial reporting were woefully inept, which further implies Defendants did not properly account for the cracking problem when they made the above statements (§VIII.A.2.);

(g) Defendants engaged in "misconduct" that "made EY unwilling to be associated with the financial statements prepared by management," including a second restatement of SunPower's 2021 financial reports. ¶¶102-105. Once SunPower had disclosed this

---

[9] The Company has also restated net loss on a quarterly basis. For 2Q21 (ended July 4, 2021), SunPower restated Net income (loss) by (2,097), from $74,769,000 to $72,672,000. And for 3Q21 (ended October 3, 2021), SunPower restated by (126,000), from $(84,307,000) to $(84,433,000). ¶86.

management misconduct associated with EY's resignation, at least one financial analyst reported, on July 5, 2024, that "there is a plausible reason to believe management may have fudged numbers" (¶108); and

(h) SunPower's belated disclosure on July 3, 2024 of an SEC subpoena, pursuant to the SEC's investigation of SunPower's previously issued financials, further implies that the above statements were materially false when issued (*see* ¶106).

### C. Defendants' Materially False and Misleading Certification of Financial and Disclosure Controls for 2Q21 and 3Q21

63. SunPower's quarterly reports for 2Q21 and 3Q21 on Forms 10-Q, filed with the SEC on August 4, 2021 and November 4, 2021, contained false and misleading representations by Faricy and Sial, that the Company's disclosure and financial controls were effective.

64. False and Misleading SOx Certifications: Each of the Forms 10-Q included Faricy and Sial's SOx Certifications, which falsely certified, in relevant part:

> [That each had] ***[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;
>
> * * *
>
> In connection with the Quarterly Report of SunPower Corporation (the "Company") on Form 10-Q for the period ended October 3, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of Peter Faricy and Manavendra S. Sial certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of his knowledge and belief:
>
> - (1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
> - (2) ***The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company***. (##31-32).

65. False and Misleading August and November Effective Controls Statements: "Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q, our chief executive officer and chief financial officer have concluded that our ***disclosure controls and procedures were effective as of July 4, 2021 ["October 3, 2021"]***. . . ." (##33-34).

66. False and Misleading Controls and Procedures Statement: Defendants also represented in SunPower's 2Q21 and 3Q21 Forms 10-Q that the Company had proper disclosure controls:

> ***We maintain "disclosure controls and procedures,"*** as defined in Rule 13a-15(e) and 15d-15(e) under the Exchange Act, ***that are designed to provide reasonable assurance that information required to be disclosed*** in reports that we file or submit under the Exchange Act ***is recorded***, processed, summarized ***and reported within the time periods specified in SEC rules*** and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure. (##35-36).

67. Reasons Why the Above Certification of Financial and Disclosure Control Statements Were False and Misleading: Each of the above statements (¶¶64-66) concerning the Company's financial and disclosure controls were materially false and misleading as Defendants knew or deliberately disregarded and failed to disclose material, adverse information, as reflected, *inter alia*, by the following facts:

(a) SunPower has admitted that there were material weaknesses in SunPower's internal controls over financial reporting before and during the Class Period, and that SunPower's disclosure controls during the Class Period were "not effective" (¶¶8-93, 100);

(b) By virtue of its first restatement, SunPower has admitted that: (i) its financial results originally issued during the Class Period, and Defendants' public statements regarding those results, were materially false; and (ii) the financial statements reported during the Class Period were materially false based on information available to Defendants at the time the results were originally reported (§VIII.B.);

(c) By virtue of the fact that SunPower announced on April 23, 2024 that it needs to issue a second restatement, and that investors should not rely on its first restatement, and disclosed yet another material weakness in financial controls, SunPower has admitted that Defendants' representations regarding controls were false (¶100);

(d) EY's abrupt resignation, and the circumstances regarding that resignation, further indicate SunPower's lack of controls during the Class Period. In reviewing and auditing SunPower's financial results, EY relied on the "representations" of "senior members of

management who had significant roles in internal control over financial reporting" – Faricy and Sial. ¶¶102, 105. EY, however, subsequently learned, and SunPower has not disputed, that Faricy and Sial engaged in misconduct related to SunPower's financial results. Such misconduct caused EY to take the highly unusual step of resigning, as EY was "unwilling to be associated with the financial statements prepared by management." ¶104. As a financial analysts would report, "EY [had] call[ed] out new SunPower management for misrepresenting the reason it resigned . . . [and] indicated that SunPower continues to cover up various allegations against current and former management that impeded its ability to provide a clean audit of the Company's books," a "shockingly bad" disclosure (¶111);

(e) SunPower's belated disclosure on July 3, 2024 of an SEC subpoena pursuant to the SEC's investigation of SunPower's previously issued financials further implies that the above statements were materially false when issued (¶99); and

(f) The magnitude of Defendants' failures to comply with GAAP, the Company's woefully inept internal controls over financial reporting and disclosure controls that have resulted in the need to restate SunPower's financial reports not once but twice, and the resignation of its auditor EY during the failed attempt to accurately report the Company's financial results for FY20 to the present, further supports the inference of falsity (*see* §VIII.A.-B.).

### D. Defendants' Materially False and Misleading Statements and Omissions About SunPower's Commercial Business

68. On August 3, 2021, the Company filed a Form 8-K attaching a release containing SunPower's financial results for 2Q21 (ended July 4, 2021) signed by Sial, which included materially false and misleading financial statements by Defendants (specifically quoting Faricy) regarding the state of the Company's commercial business, as follows:

(a) False and Misleading Continued Execution Statement: "'***Our solid second quarter results reflect continued execution in*** both our residential and ***commercial businesses . . . .***'" (#37); and

(b) False and Misleading Remain On Track Statement: "'[W]e ***remain on track to achieve our 2021 financial outlook and are well positioned to drive growth and profitability in 2022 and beyond***.'" (#38).

69. False and Misleading Margin Statement: Following issuance of the August 3, 2021 release, SunPower held a conference call for analysts and investors to discuss the financial results for 2Q21 and financial guidance for 3Q21 and FY21. The call was hosted by Faricy and Sial. During the call, Sial answered analyst questions concerning SunPower's commercial business. In doing so, he falsely touted the purported improvement in the CIS business, including from a "margin point of view."

> [Sial:] Yes. . . . On the CIS side of the house, while the business has tailwinds, the business has got a mix of projects, and we are seeing some of those projects move into 2022.
>
> * * *
>
> So from a CIS perspective, I think the second quarter margins are reflective of the inherent lumpiness in the business. We knew that going into the second quarter. Having said that, ***I think the business is significantly better year-on-year, both from a top line perspective as well as a margin point of view. And then more importantly, we expect the CIS business to be profitable in the back half of the year, which you recall is a significant turnaround from the last couple of years***. So that's the CIS business. ("Revenue and Margin Statement," Ex. A, #39).

70. Reasons Why the Commercial Business Statements Were False and Misleading: Each of the above statements (¶¶68-69) concerning the financial condition of the Company's commercial business were materially false and misleading as Defendants knew or deliberately disregarded and failed to disclose material, adverse information, as reflected, *inter alia*, by the following facts:

(a) For all the reasons described above in ¶54, the defects in third-party components were a problem that specifically affected SunPower's commercial business and would have been discovered during the due diligence process but Defendants did not disclose the cracking problem, its magnitude or its existing negative financial impact on SunPower when they spoke;

(b) SunPower's execution in the commercial business was not solid in 2Q21, and its commercial business was not significantly better year-on-year, because: (i) the cracking problem had a direct, significant, and negative impact on SunPower's net income, EBITDA, and

other reported financial metrics; and (ii) the cracking problem negatively impacted most of the Company's commercial business, so there was no reasonable basis to claim that it was solid or significantly better than the prior year while concealing the cracking problem (*see* ¶62);

(c) SunPower did not remain on track to achieve its 2021 financial outlook or drive growth and profitability in the future, or have any reasonable expectation for the CIS business to be profitable in the back half of 2021, because: (i) SunPower's reported Adjusted EBITDA and net income (losses) for 2Q21 had been overstated, and thus its financial results for 2021 had already been negatively impacted at the time of the statements (*e.g.*, ¶¶85-86); and (ii) the cracking problem negatively impacted most of the Company's commercial business, so there was no reasonable basis for Defendants to represent that SunPower remained on track to achieve financial guidance or drive growth and profitability or that the CIS business would be profitable in the second half of 2021 (*see* ¶¶54, 62; *see, e.g.*, ¶¶25, 72, 97);

(d) The magnitude and timing of SunPower's warranty reserve charges that the Company belatedly announced on January 20, 2022 indicate that Defendants were aware of, or deliberately disregarded, the cracking problem and its adverse impact on the commercial business (*see* ¶¶124, 134); and

(e) As a result of (a)-(d) above, the picture that Defendants painted of the financial health and performance of the commercial business stood in marked contrast to the reality of a business segment in which "nearly all" of its products were defective, and which was therefore exposed to millions of dollars in liabilities.

## VII. POST CLASS PERIOD EVENTS AND DISCLOSURES

71. On February 6, 2022, as reported on a Form 8-K filed with the SEC on February 10, 2022, SunPower finalized the sale of its CIS business to TotalEnergies, for $190 million with "additional consideration of up to $60 million in cash if certain legislative action is taken between February 6 and June 30, 2022."[10] The attached release, titled "TotalEnergies to Acquire

[10] The legislative action concerned extension of the solar investment tax credit ("ITC") which apparently did not pass until August 16, 2022, as part of the Inflation Reduction Act of 2022.

SunPower's Commercial & Industrial Solar Business," announced the sale of the CIS business. According to the release, the CIS sale "[f]ollow[ed] a thorough process involving discussions with a number of parties." It also noted the sale was "not expected to reduce TotalEnergies' majority ownership stake (50.83%) in SunPower."

72. On February 16, 2022, after the market closed, SunPower held a conference call for analysts and investors to discuss SunPower's financial results for 4Q and FY21. The call was hosted by Faricy and Sial. During the call, Defendants admitted that SunPower's disappointing reported EBITDA results were a direct result of the cracking problem. They also revealed that, after selling off the underperforming CIS segment, they were also looking to "exit" (*i.e.*, not sell, but abandon or reassign employees away from) the remaining portion of their commercial business, CVAR, which had also experienced what they described as the cracking problem:

> [Sial:] We are providing guidance for 2022 adjusted EBITDA in the range of $90 million to $110 million. Relative to our prior color for 2022, the midpoint represents a reduction of approximately $35 million, with $15 million coming off as a result of our plan to exit the light commercial business this year.
>
> * * *
>
> [Sial:] ***We are reporting negative $8 million of adjusted EBITDA, which includes the previously disclosed $27 million charge for crack (sic) connectors in commercial equipment*** . . . .
>
> * * *
>
> [Analyst:] And then maybe just a quick one to follow up on the light commercial exit. Is there any change to sort of a cost structure from an OpEx perspective going forward, savings, harvest, et cetera, changes to, yes, an overall cost structure by exiting that piece of the business?
>
> [Faricy:] Well, on CVAR, most of the employees we've had working on CVAR were shared between our residential business and CVAR. So to give you a quick direct answer to your business, no, I don't see a big OpEx impact. We have a small single-digit sales team that will be impacted, but I think most of the employees will reallocate to this faster-growing and more profitable residential business immediately.

73. On February 17, 2022, Bank of America issued a report titled "Tepid FY22 outlook shifts the focus to the analyst day" which described SunPower's disappointing FY21 results – "largely due to the connector quality issue" – and adverse impact from the decision to exit the light

commercial business. In the report, Bank of America also concluded that the decision to exit the Light Commercial business "appears to follow the $27mn quality issue related to the connectors":

> In continuation with SPWR's strategy to focus on the core resi business, the Company has decided to spin-off the Light Commercial business. Note that while the Light commercial business contributed ~$14mn GM in 2020, however, was margin dilutive in 2021 (***largely due to the connector quality issue***). ***Mgmt.'s decision to exit the Light Commercial business appears to follow the $27mn quality issue related to the connectors***.

74. On February 25, 2022, SunPower filed with the SEC its annual report for FY21 on Form 10-K. The annual report contained a number of financial results for FY21, including: a net loss from continuing operations of $38,042,000; "Accruals for warranties issued during the period" of $48,475,000; "Short-term warranty reserves" of $30,144,000; and "Long-term warranty reserves" of $59,962,000.

75. On May 31, 2022, SunPower filed with the SEC a release on Form 8-K announcing that "On May 31, 2022, the Company completed the previously announced sale transaction pursuant to the terms of the Equity Purchase Agreement for aggregate cash consideration of approximately $190 million, which was adjusted for, among other matters, cash, indebtedness, working capital surplus/shortfall and transaction expenses." The report did not report the price at the time of sale, but later SunPower filings, such as the Company's annual report for FY22, filed with the SEC on Form 10-K on March 10, 2023, reported that the CIS business was sold to TotalEnergies for $149.2 million.

76. On August 31, 2022, SunPower issued a release on Form 8-K announcing that, on August 26, 2022, Sial had given notice of his resignation and that the Company expected his last day to be on September 14, 2022.

77. Notably, even after selling or exiting its commercial business segments, SunPower's supply chain and related problems were not expected to be one-off problems. For example, on October 11, 2022, Bank of America issued a report downgrading SunPower that noted "the company's challenged history of execution." As Bank of America reported:

> **SPWR: Downgrade to U/Perform as Execution Risk Returns**
>
> After a series of meetings with management, dealers and ex-sales personnel, we become increasingly concerned on positioning for SPWR into 2H22 and

> 2023. . . . With management turnover likely complete with departure of ex-CFO Manu Sial in August, the new management team set a particularly low bar on 2022 already, guiding ~$30mm below street's EBITDA expectations ***at the start of the year***. Where we sit today, the risk is that with ***supply chain challenges*** outside of its MAXN channel, SPWR fails to hit even the midpoint of the lowered guide which screens as a starting point for ***further lackluster performance*** carry into 2023.

78. On March 10, 2023, SunPower filed an annual report on Form 10-K for FY22, which reported for the first time that, for the sale of the CIS business to TotalEnergies, "[w]e began incurring [] transaction costs ***in the second quarter of fiscal 2021***."

79. Just two months later, on May 3, 2023, SunPower filed a quarterly financial report on Form 10-Q with the SEC for 1Q23 (ended April 2, 2023), in which it reported that the Company had "recorded an ***additional $6.8 million of warranty expenses related to our indemnifications with TotalEnergies Renewables***."

80. On June 15, 2023, SunPower filed with the SEC a letter that stated that "[t]he wind-down activities, as well as remaining obligations on our cracked connectors quality issue, relating to our Light Commercial and CIS businesses, that was announced during January 2022, are expected to be completed by the third quarter of 2024."

81. On June 26, 2023, SunPower received a "Comment Letter" from the SEC, which set of a deadline of June 30, 2023 for SunPower to respond. SunPower responded to the SEC on July 26, 2023, after "respectfully request[ing] an extension . . . in order to gather certain necessary information from TotalEnergies." In its responding letter, SunPower responded to an instruction from the SEC, indicating that in the future SunPower would separately classify "certain of the charges related to the CIS business," and disclosing that the Company had retained additional reserves as follows:

> SunPower agreed to indemnify Total for warranty claims for certain projects that were sold prior to the sale of the CIS business on May 31, 2022. As such, ***SunPower retained $17.7 million of warranty reserves related to our indemnifications as of the date of close. In the second half of fiscal 2022 and during the first quarter of 2023, SunPower recorded additional warranty expense based on warranty claims submitted by Total of $3.5 million and $6.8 million, respectively***.

82. On August 2, 2023, SunPower filed a quarterly financial report on Form 10-Q with the SEC for 2Q23 (ended July 2, 2023), in which it reported that the Company had "***recorded an***

***additional $1.9 million and $8.7 million of warranty expenses related to our indemnifications of TotalEnergies Renewables***," for the three and six months ended July 2, 2023.

83. On October 24, 2023, SunPower filed with the SEC on Form 8-K a release dated October 19, 2023, titled "Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Reviews." The release announced the Company's intention to restate SunPower's financial reports going back to at least FY22 (starting January 4, 2022), as a result of a material weakness in the Company's internal control over financial disclosures related to issues including the value of components used in the Company's solar systems. The release further stated that the Company had "not fully completed its review," its findings were preliminary, and that its disclosure controls were not effective for the affected period.

84. In response to the Company-specific news in the aftermarket on October 24, 2023, concerning the need to restate prior financial reports, SunPower's stock price declined from a close of $4.96 on October 24, 2023, to $4.06 on October 25, 2023, an 18.1% drop, on more than 13.5 million shares trading volume as compared to only 5 million shares traded on October 24, 2023.

85. Shortly thereafter, on November 1, 2023, in conjunction with reporting the Company's preliminary financial results for 3Q23, SunPower published a "Supplemental 2020-2023 Restatement Summary of Changes" to its website, revealing that SunPower's restatement of its financial results impacted the Company's financial results not only for FY22 and the quarters to date of FY23, but also for FY20 and FY21. Significantly, the Company admitted that Class Period financial results had been falsely reported and that its financial results did not comply with GAAP as Defendants had told investors. For example, SunPower had overstated EBITDA for FY21 by $9.3 million and for FY20 by $3.1 million. The Company, in its February 16, 2022 release on Form 8-K, had initially reported EBITDA of $46.8 million for FY21 and $46.7 for FY20.[11] Thus, it had overstated EBITDA by 19.8% for FY21 and 19.9% for FY20. SunPower's Class Period financial statements included the Company's FY20 results.

---

[11] While Adjusted EBITDA is not a GAAP amount in SunPower's financial statements, it is derived from the GAAP financial statements.

86. On December 18, 2023, SunPower filed with the SEC the Company's delayed quarterly report, filed on Form 10-Q, for 3Q23, its restated quarterly reports filed on Form 10-Q for 1Q23 and 2Q23, its restated annual report, filed on Form 10-K/A, for FY22. The restated annual report for FY22 confirmed that the ***Company was restating*** the Company's financial statements not just for FY22, but also for ***each of the fiscal quarters back to FY21 (as well as full year FY20 results)***, thus including the fiscal periods overlapping with the Class Period. The 10-K/A stated in relevant part: "This Form 10-K/A includes audited restated consolidated financial statements for the fiscal years ended January 1, 2023, ***January 2, 2022 [i.e., FY21], and January 3, 2021 [i.e., FY20]***, as well as unaudited restated quarterly financial information for the quarterly periods in the fiscal years ended January 1, 2023 and ***January 2, 2022***." For example, for 2Q21 (ended July 4, 2021), SunPower restated Net income (loss) by (2,097), from $74,769,000 to $72,672,000. And for 3Q21 (ended October 3, 2021), SunPower restated its loss by (126,000), from $(84,307,000) to $(84,433,000).

87. The December 18, 2023 restated annual report, filed by SunPower on Form 10-K/A on December 18, 2022, also disclosed that "[s]ubstantial doubt exists about our ability to continue as a going concern."

88. The December 18, 2023 restated annual report further disclosed that SunPower had still not completed its repairs or replacements of cracked connectors and had taken another $3.5 million in charges for warranty expenses to indemnify TotalEnergies.

89. The December 18, 2023 restated annual report also reported that the Company had identified misstatements about components of its solar products, and that those misstatements were the product of material weaknesses in the Company's internal controls.

90. The December 18, 2023 restated annual report additionally explained that the errors and material weaknesses related to improper classification of expenses extended back to FY20 (ended January 3, 2021), including misclassifying both costs of revenues and items pertaining to the "discontinued operations," which referred to SunPower's commercial business:

> In fiscal year 2023, ***we identified errors related to the classification of certain expenses as cost of revenues instead of operating expenses and as continuing operations instead of discontinued operations***. We identified

> deficiencies in the design of the controls related to the mapping of the chart of accounts for expenses to the statement of operations. ***We further identified an operating deficiency related to the review of the accounting evaluation regarding the classification of certain discontinued operations items within the statements of operations***. These deficiencies in aggregate were determined to be a material weakness. This material weakness resulted in the misclassification of certain expenses on our consolidated statements of operations for the fiscal years ended ***January 1, 2023, January 2, 2022, and January 3, 2021***.

91. The December 18, 2023 restated annual report also reiterated that the Company's disclosure controls were not effective for the period from FY20 through 3Q23.

92. SunPower's restatements had a significant impact on SunPower's previously issued earnings for the Class Period. For example, the 10-K/A reported that, for FY21 (ended January 2, 2022), total revenues had been reduced by $3,671,000 to $1,128,358,000. SunPower reported in the Form 10-K/A a negative -$9.3 million downward revision to "Net Income (Loss)" for FY21. That amount that matches the -$9.3 million adjustment to EBITDA reported in the November 2023 summary described above. ¶85. The restatement changes for revenue and net income for FY22 and FY21 are summarized in this chart:

| In thousands | FY22 (filed 3/10/22) | FY22 (restated 12/18/23) | Revision | FY21 (from FY22 filed 3/10/22) | FY21 (restated 12/18/23) | Revision |
|---|---|---|---|---|---|---|
| Revenue | $1,741,072 | $1,741,943 | $871 | $1,132,029 | $1,128,358 | -$3,671 |
| Net income (loss) | $60,463 | $47,275 | -$13,188 (-21.8%) | $(38,042) | $(47,387) | -$9,345 (-19.7%) |

93. Also on December 18, 2023, SunPower filed a quarterly financial report on Form 10-Q with the SEC for 3Q23 (ended October 2, 2023), in which it reported that the Company had taken another $0.3 million in warranty expenses and had taken an additional $2.3 million of warranty reserves for the three and nine months ended October 2, 2022 (*i.e.*, 3Q22).

94. The same day, on December 18, 2023, SunPower also filed a release on Form 8-K, which announced that SunPower had violated certain of its debt covenants.

95. In response to the Company-specific news on December 18, 2023, including issuance of the restatements and the ongoing concern warning, SunPower's stock price declined from a close of $6.14 on Friday, December 15, 2023, to $4.22 on Monday, December 18, 2023, a

21.2% drop, on more than 48 million shares trading volume as compared to only 13.1 million shares traded on December 15, 2023.

96. On February 15, 2024, SunPower and its current management held an earnings call to discuss the Company's financial results and guidance for 4Q23 and FY23. During the call, SunPower's new CFO, who had replaced Sial, confirmed that SunPower was still paying warranty costs related to the commercial business that SunPower had sold to TotalEnergies:

> Several items totaling $48 million are also either not expected to recur in 2024 or were time shifted into Q1, including the restatement impact, adjustment for inventory writedown, ***warranty costs mostly related to our commercial business that we sold in 2022***. . . .

97. Following this news, on February 16, 2024, Morgan Stanley noted that SunPower had reported that "gross margin was weaker than expected, driving downside to adj. EBITDA" and explained that SunPower attributed the downside to EBITDA, in part, to warranty costs.

98. On February 27, 2024, SunPower filed with the SEC on Form 8-K a release announcing that Faricy, just two years after joining SunPower as CEO, President, and as a member (and for a shorter period, Chairman) of the Board, had abruptly resigned all positions with SunPower, effective February 26, 2024, and did not identify a replacement.

99. The next day, on February 28, 2024, as SunPower would belatedly report on a July 3, 2024 filing with the SEC, "the SEC issued a document subpoena to the Company, which relates to certain accounting matters, including aspects of the Company's revenue recognition practices, with a focus on the periods covered by the Affected Financial Statements. . . ." The Affected Financial Statements refers to the financial results SunPower had restated, *i.e.*, for FY20 through the quarters it reported for FY23.

100. On April 23, 2024, SunPower filed with the SEC on Form 8-K a release that disclosed that the Company's restated financial filings, issued only four months prior, should no longer be relied upon, and that the Company was planning to file a second restatement:

> The Company plans to restate, as soon as practicable, the Affected Prior Period Financial Statements.[12]
>
> * * *
>
> At this time, ***the Company has not fully completed its review, and the expected financial impact of the errors described above is preliminary and subject to change. The Company cannot provide assurance that other errors will not be identified***.
>
> . . . the Company's management has concluded that a ***new material weakness*** exists in the Company's internal control over financial reporting. The Company's remediation plan with respect to such material weakness will be described in more detail in the Company's ***amended 2022 Form 10-K/A***.

101. In response to the Company-specific news on April 23, 2024, SunPower's stock price declined from a close of $2.14 on April 22, 2024, to $1.96 on April 23, 2024, a 9% drop, on more than 10.99 million shares trading volume as compared to only 3.34 million shares traded on April 22, 2024.

102. Fewer than three months later, on July 3, 2024, SunPower filed with the SEC on Form 8-K a release announcing that its auditor, EY, had resigned due to "***misconduct by senior members of management, who had significant roles in internal control over financial reporting***." EY further had indicted to SunPower that the senior management involved in misconduct are not current employees. The description implicates Faricy (resigned February 26, 2024) and Sial (resigned August 26, 2022). *The Motley Fool* reported on July 8, 2024 in an article titled "Why Renewable Energy Stocks Plunged in June," that EY was likely referring to Faricy and others.

103. SunPower, in its July 3, 2024 release, further disclosed, in relevant part, that EY had taken the highly unusual step of resigning immediately without SunPower or its audit committee's approval as a result of prior management's misconduct, and reported that:

> As previously disclosed in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") on April 23, 2024, the Audit Committee has previously determined that the Company's (a) ***audited financial statements included in the Company's Annual Report on Form 10-K/A***

---

[12] The affected periods were for FY20 through FY23, to include all Class Period quarterly and annual financial reports (previously all restated as part of the 10-K/A for FY22, filed December 18, 2023).

> ***for the period ended January 1, 2023 (****the “****2022 Form 10-K/A****”)*, and (b) unaudited financial statements included in the Company’s Quarterly Report on Form 10-Q/A for the quarterly period ended April 2, 2023; Quarterly Report on Form 10-Q/A for the quarterly period ended July 2, 2023; and Quarterly Report on Form 10-Q for the quarterly period ended October 1, 2023 (collectively, and together with the 2022 Form 10-K/A, the “Affected Financial Statements”), ***should no longer be relied upon and should be restated due to accounting errors in each of the Affected Financial Statements***. Similarly, ***any previously issued or filed reports, press releases, earnings releases, investor presentations or other communications of the Company describing the Company’s financial results or other financial information relating to the periods covered by the Affected Financial Statements should no longer be relied upon***. In addition, the report of EY on the Company’s financial statements and internal control over financial reporting included in the previously filed 2022 Form 10-K/A should no longer be relied upon.

104. The July 3, 2024 release further went on to disclose SunPower’s version of the disagreements EY had with SunPower, including “misconduct” by prior “senior members of management,”[13] including in pertinent part that:

> 1. On April 8, 2024, EY advised the Audit Committee that internal controls necessary to develop reliable financial statements do not exist due to an ineffective control environment.
>
> 2. On June 27, 2024, EY advised the Audit Committee that information has come to its attention that has ***made EY unwilling to be associated with the financial statements prepared by management***.
>
> 3. In connection with EY and the Company’s discussions regarding EY’s audits and reviews of the Affected Financial Statements during April 2024 through June 2024, EY advised the Company and Audit Committee ***of the need to expand significantly the scope of its audit procedures, and that information has come to EY’s attention that, if further investigated, may materially impact the fairness or reliability of the Company’s financial statements, or cause EY to be unwilling to rely on management’s representations or be associated with the Company’s financial statements***. Given that the Company’s process for addressing the restatements of the Affected Financial Statements and preparing its financial statements for the year ended December 31, 2023, remains open, the expansion of the scope of its audit was not completed prior to EY’s resignation.
>
> 4. In connection with EY and the Company’s discussions regarding EY’s audits and reviews of the financial statements during April 2024 through June 2024, EY advised the Company and Audit Committee that information had come to its attention that materially impacts the fairness

[13] Tom Werner is currently serving as SunPower’s Principal Executive Officer and Executive Chairman while SunPower searches for a new CEO. Elizabeth Eby was appointed to Chief Financial Officer to replace Sial.

> or reliability of the Company's financial statements. Given that the Company's process for addressing the restatements of the Affected Financial Statements and preparing its financial statements for the year ended December 31, 2023, remains open, the issues raised were not resolved to EY's satisfaction prior to its resignation.

105. The July 3, 2024 release additionally described SunPower's characterization of EY's account of management misconduct:

> During the two most recent fiscal years ended December 31, 2023 and January 1, 2023 and the subsequent interim period preceding EY's resignation, there were no disagreements (as described in Item 304(a)(1)(iv) of Regulation S-K under the Exchange Act), except as follows:
>
> [5th paragraph] ***EY believes that allegations of misconduct by senior members of management, who had significant roles in internal control over financial reporting and upon whose representations EY relied***, were within the scope of EY's audit. The Audit Committee previously had a good faith understanding that its obligations were limited to reporting to EY allegations of misconduct that bore on the accuracy of the Company's financial statements by senior members of management who had significant roles in internal control over financial reporting and upon whose representations EY relied. ***The allegations that were the subject matter of discussion between EY and the Audit Committee regarding this reporting obligation do not relate to current senior members of management***. The Audit Committee was prepared to provide broader disclosure and was in discussions with EY concerning the scope of the disclosure obligation at the time of EY's resignation. Accordingly, there was a disagreement between the Company and EY regarding this aspect of EY's auditing scope or procedures at the time of EY's resignation.
>
> [6th paragraph] The Audit Committee has discussed the foregoing matters with EY. The Company has authorized EY to respond fully to the inquiries of any successor independent registered public accounting firm concerning the subject matter of the items described herein. The Company will describe any material weaknesses identified and related remedial measures to be taken as required in its Exchange Act filings.

106. The July 3, 2024, report also disclosed, for the first time, that the SEC had subpoenaed the Company in February and was "investigati[ng] . . . the Company's revenue recognition practices, with a focus on the periods covered by the Affected Financial Statements," which extended back to FY20 (*i.e.*, through and including the Class Period).

107. In response to the Company-specific news on July 3, 2024, SunPower's stock price declined from a close of $2.68 on Wednesday July 3, 2024, to $2.08 on Friday July 5, 2024 (*i.e.*,

the first trading day after the July 4 holiday), a 22.4% drop, on more than 19.5 million shares trading volume as compared to only 3.9 million shares traded on July 3, 2024.

108. On July 5, 2024, *The Motley Fool* published an article titled "Why SunPower Plunged Today," explaining that "Ernst & Young . . . resigned. . . . And the reasons for the resignation didn't sound good." The financial analyst continued: "EY's statement today appears to indicate outright misconduct. That is, needless to say, a pretty ominous note." And it continued, "SunPower's survival is in question. . . . While evidence has yet to come out, ***there is a plausible reason to believe management may have fudged numbers in order to make itself look more attractive***."

109. Nine days after SunPower disclosed EY's resignation, on July 12, 2024, SunPower filed a Form 8-K/A with SEC attaching EY's response letter to SunPower's July 3, 2024 Form 8-K. In the letter, EY disputed a number of SunPower's contentions from the July 3, 2024 Form 8-K. EY specifically indicated, in relevant part, with respect to the fifth and sixth paragraphs, set forth above (¶105):

> ***We disagree with the characterization of the disagreement as described by the registrant in the fifth and sixth paragraphs therein***. There was a disagreement between EY and the Company regarding audit scope, specifically regarding our expectation that we would be informed of ***allegations against current or former members of management who have or had significant roles in internal control over financial reporting and whose representations we rely upon, or previously had relied upon, in performing our audits***, even if those allegations did not expressly assert that there were errors in the Company's financial statements, and that the evaluation of such allegations was within the scope of our audit procedures. After we became aware that ***not all such matters had been disclosed to us, we communicated the need for the Company and its Audit Committee to disclose them to EY, and we believed there was agreement on this point. However, the discovery of additional such allegations that had not been disclosed to EY*** indicated that a disagreement existed regarding our auditing scope or procedures.

110. In response to the Company-specific news in the aftermarket on July 12, 2024, when SunPower filed EY's letter concerning its resignation as SunPower's auditor, SunPower's stock price declined from a close of $2.69 Friday July 12, 2024, to $2.50 on Monday July 15, 2024, a 7% drop, on approximately the same number of shares traded as the prior trading day (6.9 million on July 15 slightly down from 7.2 million on July 12).

111. On July 15, 2024, TipRanks reported that a GLJ Research analyst had commented "SunPower on Friday issued one of the most 'shockingly bad' regulatory disclosures the firm has seen." It went on to indicate that the "filing provided additional information from [EY] regarding its resignation of auditor, with EY calling out new SunPower management for misrepresenting the reason it resigned. . . . EY writes that SunPower continues to cover up various allegations against current and former management that impeded its ability to provide a clean audit of the Company's books."

112. Following the above news, on August 5, 2024, SunPower filed for bankruptcy, and it announced that as of August 16, 2024, SunPower was to be delisted from NASDAQ (as NASDAQ informed SunPower on August 7, 2024).

## VIII. ADDITIONAL DISCLOSURE CONTROLS AND GAAP ALLEGATIONS, AND OTHER ALLEGATIONS SUPPORTING FALSITY AND SCIENTER

### A. SunPower's Admitted GAAP Violations and Material Weaknesses in Internal Controls, and Ineffective Disclosure Controls, Further Evidence Falsity and Support a Strong Inference of Scienter

#### 1. SunPower's GAAP Violations

113. Defendants represented to investors in SunPower's 2Q21 and 3Q21 quarterly flings on Forms 10-Q that the Company's financial statements were prepared in accordance with GAAP: "We prepare our unaudited condensed consolidated financial statements in conformity with U.S. GAAP."

114. GAAP comprises the standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.[14] SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

115. During the Class Period, as alleged herein, Defendants were aware of significant defects in third-party components affecting nearly all of SunPower's commercial solar systems.

---

[14] The SEC has the statutory authority for the promulgation of GAAP for public companies and has generally delegated that authority to the Financial Accounting Standards Board ("FASB").

As a result of the defects, Defendants knew SunPower would be required to incur, or should have already incurred, tens of millions of dollars in warranty expenses to repair or replace those defective third-party components. As discussed below, GAAP, required Defendants to accrue for such warranty expenses as contingent losses. Despite this knowledge, Defendants failed to adequately factor this information into the assumptions used in the warranty reserve estimate during the Class Period and beyond. SunPower's failure to record adequate warranty reserves for the cracked and otherwise defective third-party components of at least $26.5 million caused the Company's EBITDA and net income to be overstated by a corresponding amount during the Class Period.

116. Obligations related to product warranties and product defects are loss contingencies. ASC 450-20-05-3.[15] GAAP, specifically ASC 450 Contingencies, required Defendants to accrue for and/or disclose estimated warranty expenses as contingent losses for SunPower.

117. The FASB defines a loss contingency as the following:

> An existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur. The term loss is used for convenience to include many charges against income that are commonly referred to as expenses and others that are commonly referred to as losses. (ASC 450-20-20).

118. The FASB indicates the financial statement treatment of a loss contingency is determined by the likelihood that future events will confirm the loss or impairment of an asset or incurrence of a liability and the measurability of amounts. For this purpose, the FASB indicates that the likelihood ranges from remote to reasonably possible to probable, stating as follows:

> When a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote. As indicated in the definition of contingency, the term *loss* is used for convenience to include many charges against income that are commonly referred to as expenses and others that are commonly referred to as losses. The Contingencies Topic uses the terms ***probable***, reasonably possible, and ***remote*** to identify three areas within that range. (ASC 450-20-25-1).

[15] ASC refers to FASB Accounting Standards Codification, which is the source of authoritative GAAP.

119. According to ASC 450, if both of the following two conditions are met, a loss is to be recognized as a charge against income: (1) if information is available that indicates it is probable that an asset has been impaired or a liability incurred; and (2) the amount of the loss can be reasonably estimated. ASC 450-20-25-2 states:

> An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:
>
> a. Information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25) indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. Date of the financial statements means the end of the most recent accounting period for which financial statements are being presented. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b. The amount of loss can be reasonably estimated.

120. If the likelihood of occurrence is probable but the amount cannot be reasonably estimated or if the probability of occurrence is determined to be reasonably possible whether or not the amount can be reasonably estimated, the proper treatment is to disclose the loss contingency in the footnotes of the financial statements. (ASC 450-20-50-3). Such disclosure shall include the nature of the contingency and an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made. (ASC 450-20-50-4).

121. Only when the likelihood of occurrence is remote and the amounts are not reasonably estimable is it acceptable to neither recognize the loss contingency in the accounts nor disclose the contingency in the notes to the financial statements.

122. Defendants understood that they were required to reserve for SunPower's losses where it is probable that liability has been incurred. For example, in a June 4, 2020 letter to the SEC, Sial told the SEC that SunPower reserves included estimated costs for claims that "could" be brought "irrespective of whether a claim was received or not."

123. During the Class Period, SunPower's financial statements did not comply with GAAP because Defendants did not accrue for and/or disclose the Company's contingent loss for warranty expenses as a result of the defective connectors SunPower sold to commercial customers. The disclosure of such a loss would have necessarily required SunPower to disclose that it had a

contingent loss associated with its defective commercial products since GAAP requires such disclosures to include the nature of the loss contingency as well as the amount or range of possible amounts. (ASC 450-20-50-1 through 5).[16]

124. It was not until 2022 that SunPower belatedly began recognizing losses related to the warranty issues and disclosing the "issue with third-party connectors used in certain of [SunPower's] products" when SunPower recorded accounting charges of $26.5 million related to repair costs and that they expected to record additional charges of $4 million in 1Q22.[17] Following this revelation, SunPower revised those amounts and took additional warranty reserve charges related to the CIS business it sold in early 2022, as follows: $19.8 million for 4Q21 (reported 3/10/23); $3.5 million for FY22 (12/18/23), $6.8 million for 1Q23 (5/3/23), $1.9 million for 2Q23 (8/2/23), and $0.3 million for 3Q23 (12/18/23) for a total of at least $32.3 million.

**2. SunPower's Ineffective Controls**

125. Internal control is a process designed by, or under the supervision of, the CEO and CFO and carried out by a company's board of directors, management and other personnel, to provide reasonable assurance that, among other things, the financial statements are reliable and accurate and that a company complies with applicable laws and regulations.

126. Faricy and Sial each certified in connection with SunPower's Forms 10-Q for 2Q21 and 3Q21 filed with the SEC on August 4, 2021 and November 4, 2021 that they were personally responsible for SunPower's internal controls: "I [am] responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e))

---

[16] Even if Defendants learned of the cracking problem after the end of a quarter, but before reporting the results for that quarter, they were required under GAAP to accrue warranty reserves and to disclose the cracking problem and its impact on SunPower in reporting the prior quarter's results. Thus, even if Defendants learned of the cracking problem after July 4, 2021, or after October 3, 2021 (end of 2Q21 and 3Q21, respectively), but before reporting 2Q21 results on August 3 and 4, 2021, or 3Q21 results on November 3 and 4, 2021, respectively, they were not permitted to wait until the next quarter's financial report to disclose the problem or impact to SunPower.

[17] The ~$26.5 million for 4Q21 was announced by SunPower in January and February 2022. The Company would later, in its annual report for FY22 (filed March 10, 2023 on Form 10-K), revise this figure for 4Q21 without explanation. And more recently, on April 23, 2024, SunPower notified investors not to rely on its financial reports.

and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant."

127. In addition to making representations about SunPower's internal controls, in each quarterly filing for 2Q21 and 3Q21 Faricy and Sial also assured investors that Faricy as CEO and Sial as CFO "have concluded that our ***disclosure*** controls and procedures were effective" as of "July 4, 2021" or "October 3, 2021."

128. Faricy and Sial further certified that they had designed SunPower's disclosure controls to ensure that material information related to SunPower was properly disclosed, that each had evaluated the effectiveness of the Company's disclosure controls, and that they had designed internal control over financial reporting to provide reasonable assurance regarding the reliability of SunPower's financial reporting, as follows:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; [and]
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation[.]

129. In addition, Defendants represented in SunPower's 2Q21 and 3Q21 Forms 10-Q that the Company had proper disclosure controls, including such controls that ensured that Faricy and Sial were timely provided the necessary information so make appropriate disclosures:

> We maintain "disclosure controls and procedures," as defined in Rule 13a-15(e) and 15d-15(e) under the Exchange Act, that are designed to provide reasonable assurance that information required to be disclosed in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

130. In the quarterly reports, Faricy and Sial also both signed the following statement certifying the compliance, accuracy, and completeness of their quarterly financial reports:

> In connection with the Quarterly Report of SunPower Corporation (the "Company") on Form 10-Q for the period ended October 3, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of Peter Faricy and Manavendra S. Sial certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of his knowledge and belief:
>
> (1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

131. As detailed herein, the Company has admitted that the above-representations were false. SunPower has admitted that there were material weaknesses in SunPower's internal controls over financial reporting before and during (and after) the Class Period.[18] *See* ¶¶89-90, 100.

132. SunPower has also admitted that the material weaknesses rendered SunPower's disclosure controls during the Class Period "not effective." *See* ¶91. As SunPower reported in its December 18, 2023 restated annual report: "The Company's management has concluded that in light of the findings described above, the Company's disclosure controls and procedures for the Affected Periods were not effective because of material weaknesses in its internal control over financial reporting."

133. The lack of controls also resulted in the Company violating GAAP. SunPower violated GAAP by falsely stating its financial results during the Class Period (*i.e.*, in falsely reporting the Company's 2Q21, 3Q21, and FY21 financial results, as well as for FY22, which overlaps with the last weeks of the Class Period). *See* §VIII.B.

134. These failures had a significant impact on SunPower's financials. Defendants' failure to record adequate warranty reserves for the cracked and otherwise defective third-party

---

[18] "A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." (Public Company Accounting Oversight Board ("PCAOB") Auditing Standard ("AS") 2201.A7).

components of at least $32.3 million caused the Company's EBITDA and net income to be overstated by a corresponding amount. *See* ¶¶85, 92, 124. For example, as Sial confirmed on November 16, 2022, "We are reporting negative $8 million of adjusted EBITDA, ***which includes the previously disclosed $27 million charge for crack (sic) connectors in commercial equipment***." ¶72. And as the Company reported in the summary of restatement changes it released on November 1, 2023, SunPower had overstated EBITDA (and understated net loss) for FY21 by ***$9.3 million***. ¶85.

135. The lack of controls further resulted in the resignation of the Company's auditors, EY (¶¶102-105), who resigned due to the "misconduct" of senior management (including Faricy and Sial, ¶102) and because EY could no longer rely on management representations of the Company. ¶104. Significantly, EY disputed SunPower's contention that Defendants' misconduct exceeded the scope of EY's audit. SunPower described the situation as follows: "EY believes that allegations of misconduct by senior members of management, who had significant roles in internal control over financial reporting and upon whose representations EY relied, were within the scope of EY's audit." ¶¶105, 109. This further suggests that the subjective assumptions and representations from management that EY relied on, and identified as a Critical Audit Matter, in calculating warranty reserve costs (¶24), was unreliable during the Class Period.

136. <u>Summary of Further Reasons Why the Alleged Statements Were Materially False and Misleading or Omitted Adverse, Material Information</u>: For the foregoing reasons, SunPower's internal controls over financial reporting and disclosure controls were not effective during the Class Period. As a result, Defendants' alleged misrepresentations concerning: (i) the risk that SunPower might or could experience defects or other quality issues in its products or product components; (ii) the Company's warranty reserves and the Company's corresponding financial results; (iii) the Company's financial and disclosure controls; and (iv) the condition of the Company's commercial business, were further false and misleading in context, and further made with scienter, including for the following reasons:

(a) SunPower's financial reports did not comply with GAAP, including because the significant defects in third-party components used in nearly all SunPower's

commercial solar systems during the Class Period (*see* ¶¶118-124) required SunPower to contemporaneously incur tens of millions in warranty costs to repair or replace those defective third-party components. Despite this fact, Defendants failed to adequately factor this information into the assumptions they were responsible for and used in SunPower's warranty reserve estimate during the Class Period (and beyond);

(b) Defendants had no reasonable basis to warn of quality defects potentially impacting the Company when SunPower did not have effective controls given the widespread product defects and SunPower's admitted lack of effective disclosure controls (*see* ¶54);

(c) Defendants had no reasonable basis to attest to the effectiveness of the Company's controls over financial reporting or disclosure controls. The Company has belatedly admitted that the Company's controls were woefully ineffective (*see* ¶62);

(d) Defendants had no reasonable basis to make the alleged false and misleading statements, in particular the Continued Execution, On Track, and Revenue and Margin Statements, because each of those representations was premised on SunPower's financial results. The material weakness in the Company's internal controls over financial reporting caused the Company's financial results to be falsely stated at the time they were reported (*see* ¶67);

(e) Faricy and Sial's SOx Certifications and the other signed verifications that they had designed SunPower's controls and that SunPower's disclosure controls and internal controls over financial reporting were effective at the time of the alleged statements, are additional evidence of Defendants' attention to adverse facts concealed by their alleged statements, and of their scienter; either Defendants knew the Company's controls were not effective, and they knowingly made the alleged statements, or they did not know the controls were not effective, because they had not in fact taken steps to confirm their effectiveness, and therefore were reckless in making the statements in unconfirmed reliance on the effectiveness of internal and disclosure controls;

(f) In auditing and reviewing SunPower's financial results and reports, which formed the basis for the statements and in which a number of the statements were made, EY relied on the "representations" of "senior members of management who had significant roles in internal

control over financial reporting" – Faricy and Sial. EY has represented that senior management (*i.e.*, Faricy and Sial) engaged in misconduct – a fact SunPower has not disputed. ¶¶102-105, 109. The misconduct was related to SunPower's financial results and so significant that it caused EY to resign immediately when the auditor learned the Company had failed to disclose further instances of misconduct (*id.*); and

(g) The magnitude of Defendants' failures to comply with GAAP, coupled with the Company's woefully inept internal controls over financial reporting and ineffective disclosure controls, have resulted in the need for the Company to restate SunPower's financial reports not once but twice, and the resignation of its auditor EY during the failed attempt to accurately report the Company's financial results for FY20 to the present, further supports the inference of falsity and scienter.

**B. SunPower's Restatements of SunPower's Financial Results During the Class Period Further Supports Falsity and Scienter**

137. The fact that SunPower restated its previous financial statements is an admission that: (i) the financial results originally issued during the Class Period and Defendants' public statements regarding those results were false; and (ii) the financial statements reported during the Class Period were incorrect based on information available to Defendants at the time the results were originally reported. As noted by the SEC, "GAAP only allows a restatement of prior financial statements ***based upon information 'that existed at the time the financial statements were prepared***,'" and "restatements should not be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared."

138. The FASB, the governing body that promulgated the accounting rules regarding restatements of prior financial statements, has defined "restatement" as "[t]he process of revising previously issued financial statements to reflect the correction of an error in those financial statements." (ASC Master Glossary). FASB has also defined the "errors" that may be corrected through a restatement: "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of [GAAP],

or oversight or misuse of facts ***that existed at the time that the financial statements were prepared***." *Id.*

139. SunPower's first restatement was not due to a simple mathematical error, honest misapplication of a standard, or oversight. Rather, SunPower has admitted it was due to accounting errors concerning SunPower's costs of revenue, and affecting SunPower's reported earnings, that existed at the time SunPower first reported its financial results, including for 2Q21 and 3Q21 during the Class Period.

140. Moreover, SunPower's own former auditor has placed the blame for the restatements and EY's resignation squarely on SunPower's double "misconduct": first, the known "misconduct by senior members of management" – Faricy and Sial – "who had significant roles in internal control over financial reporting" (¶¶102-105); and second, the undisclosed misconduct EY told SunPower to alert them to if committed by those same senior members of management – *i.e.*, "[we] expect[ed] that we would be informed of allegations against current or former members of management. . . whose representations we rely upon, or previously had relied upon. . . ." ¶109.

141. As alleged herein, on December 18, 2023, SunPower restated more than three full years of financial statements. ¶86. For example, the Company reported in the summary of restatement changes it released on November 1, 2023, SunPower had overstated EBITDA (and understated net loss) for FY21 by $9.3 million. ¶¶85, 92. But those restated earnings only lasted four to five months before SunPower repudiated them, instructing investors not to rely on them and to wait for SunPower to restate those years' financial results a second time. ¶100. In the meantime, Sial and Faricy have left the Company along with a host of others as explained below. In addition, SunPower's auditor has resigned, accusing former management of misconduct, the Company has filed for Bankruptcy, faces delisting, and has been unable to file financial results for the past three years with any reasonable assurance of their accuracy. Thus, there is every reason to believe that SunPower's misstated financials will come out much worse once (if) SunPower is able to restate them a second time.

**C. The Exodus of SunPower Executives and its Auditor Further Supports a Strong Inference of Scienter**

142. The timing, circumstances, and sheer number of the departures of high ranking SunPower executives, directors, and the Company's auditor is also strongly indicative of scienter. In the period between the end of the Class Period, through the SEC's issuance of a subpoena to SunPower as part of its investigation, SunPower's top-ranking executives with responsibility for SunPower's financial reports departed. Many of these executives, like Faricy, resigned abruptly and without a replacement, further suggesting that these executives either knew of Faricy and Sial's misconduct and did not want to be associated with it or had been direct participants in the misconduct.

143. The first departures actually occurred almost contemporaneously with SunPower belatedly reporting that it was taking $26.5 million in charges because of cracked connectors which negatively impacted its 2021 EBITDA results. Less than a week after announcing this abysmal news, on January 26, 2022, SunPower filed a release with the SEC on Form 8-K announcing the resignation of two board members, Julien Pouget and Patrick Wood III. Mr. Pouget, a designee of TotalEnergies who, according to the TotalEnergies Complaint, featured prominently in the negotiations to sell the CIS business to TotalEnergies, left effective the day before the announcement: January 19, 2022. TotalEnergies designees Frank Trochet (March 31, 2022), and Bernadette Baudier (April 21, 2022), left shortly thereafter.

144. On May 10, 2022, fewer than three months after SunPower announced taking a $26.5 million to repair and replace cracked connectors and the related impact to the Company's financials (such as EBITDA), SunPower issued a release on Form 8-K announcing that Regan J. MacPherson, SunPower's Executive Vice President and Chief Legal Officer for a mere year, had notified SunPower of her intent to resign from the Company on May 9, 2022. The Company did not announce a replacement for Ms. MacPherson.

145. On August 31, 2022, SunPower issued a release on Form 8-K announcing that, on August 26, 2022, Sial had given his resignation notice and that the Company expected his last day

to be on September 14, 2022. SunPower replaced him with an interim CFO having no permanent replacement.

146. On September 23, 2022, TotalEnergies designees Laurent Wolffsheim and Francois Badoual followed Sial out of the Company.

147. On September 13, 2023, just one month before announcing that the Company's financial results would need to be restated, SunPower issued a release filed with the SEC on Form 8-K announcing the resignation of Vichheka Heang as Vice President, Corporate Controller, and Principal Accounting Officer of the Company. Ms. Heang had served as the Corporate Controller since November 2018 and became the Principal Accounting Officer on March 8, 2019.

148. On February 27, 2024, following the Company's massive restatement on December 18, 2023 and just one day before the SEC issued a formal subpoena to SunPower related to the Company's financial reports, SunPower filed with the SEC on Form 8-K a release abruptly announcing that Faricy, just two years after joining SunPower as CEO, President, and later Chairman of the Board, had resigned all positions with SunPower, effective February 26, 2024. The same day that Faricy resigned without a replacement, so too did Nathalie Portes-Laville, another TotalEnergies board member designee who had been appointed in October of 2021.

149. Further, as discussed above, on June 27, 2024 (as SunPower disclosed on July 3, 2024), EY resigned, with SunPower's previously restated financial results not being re-restated, and under the shockingly bad announcement regarding management misconduct. EY's resignation was sudden, highly unusual, and without SunPower or its audit committee's approval.

150. Shortly after the July 3 and 12, 2024, revelations that EY had resigned, on July 17, 2024, Vincent Stoquart, a TotalEnergies board member designee who had been directly involved in the sale of the CIS business since early 2021, resigned his position.

## IX. ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS

151. Defendants' deceptive conduct, fraudulent scheme, misrepresentations, and omissions of material facts were a significant cause of the artificial inflation of the price of SunPower's securities throughout the Class Period.

152. As detailed herein, the Defendants issued materially false and misleading statements and omissions concerning: (i) the risk that SunPower might or could experience defects or other quality issues in its products or product components; (ii) the Company's warranty reserves and related financial results; (iii) the Company's financial and disclosure controls; and (iv) the financial condition of the Company's commercial business, and participated in a fraudulent scheme. Defendants' deceptive conduct, fraudulent scheme, misrepresentations, and omissions of material facts caused SunPower's publicly traded securities to trade at artificially inflated prices throughout the Class Period, including a Class Period stock price high of $34.61 on November 1, 2021 for SunPower's stock; a significant increase from SunPower's stock price close of $24.18 per share on August 2, 2021, the day before the Class Period. As the truth regarding Defendants' misrepresentations and omissions as well as deceptive conduct became generally known, the price declined as the artificial inflation dissipated and Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws. These disclosures of the truth include, but are not limited to, the following:

153. On January 20, 2022, after market hours, SunPower issued a release on a Form 8-K filed with the SEC announcing that the Company would miss its financial guidance due to "cracking" problems associated with products across its commercial businesses. The release stated in relevant part:

> SAN JOSE, Calif. (January 20, 2022) – SunPower Corp. (NASDAQ:SPWR), a leading solar technology and energy services provider, today announced it is taking proactive measures to enhance customer care by replacing certain third-party connectors within its Light Commercial Value-Added Reseller (CVAR) and Commercial & Industrial Solutions (CIS) systems.
>
> ***Through a product quality assessment, the company has identified a cracking issue*** that developed over time ***in certain factory-installed connectors within third-party commercial equipment supplied to SunPower***. There have been no reported safety incidents attributed to this issue, nor has there been any degradation of performance. Nevertheless, to avoid potential longer-term complications and ensure an excellent lifetime customer experience, ***SunPower is proactively replacing all of these connectors***. The company plans to replace the connectors in impacted equipment largely during 2022.
>
> ***SunPower expects approximately $27 million of supplier-quality related charges in fourth quarter 2021 and approximately $4 million in the first quarter of 2022*** as it pursues recovery of costs from the suppliers. The charges are expected to be funded with cash on hand.

> GAAP Revenue for fourth quarter 2021 is expected to fall within the previously guided range of $361 to $421 million. Excluding the charge, fourth quarter adjusted EBITDA results are expected to be at the low end of SunPower's previously disclosed guidance range of $18 to $41 million. Factors affecting fourth quarter adjusted EBITDA include approximately $6.5 million of Residential EBITDA effectively pushed into 2022 as the result of weather in California and COVID impacts. Another $3 million was invested in sales and marketing to rapidly expand SunPower's serviceable solar market to more customers in underpenetrated areas nationally.
>
> *   *   *
>
> SunPower also announced the appointment of Derek Kuzak as Executive Vice President for Supply Chain, Quality, and Field Operations.
>
> *   *   *
>
> As previously announced, SunPower is pursuing a sale of its CIS business as part of its growing focus on and investment in its high-growth residential business. SunPower remains in ***advanced discussions*** for the sale of CIS and expects to finalize an agreement within weeks. No final agreement has been reached and there can be no assurances that any transaction will result.

154. In response to this new, Company-specific news in the aftermarket on January 20, 2022, SunPower's stock price declined from a close of $19.02 on January 20, 2022, to $15.80 on January 21, 2022, a 16.9% drop, on more than 11.4 million shares trading volume as compared to only 2.8 million shares traded on January 20, 2022. However, the price of the Company's securities after the January 20, 2022 disclosure remained artificially inflated, including because the full impact of SunPower's cracking problem in its commercial business and Defendants' failures to properly reserve for corresponding warranty costs or maintain effective disclosure controls and internal controls over financial reporting had not yet been fully revealed.

155. On January 20, 2022, Truist Securities issued a report titled "SPWR Notes Residential Softness in 4Q, Product Recall event in Commercial Business" which reported, among other things, that SunPower would have to replace defective third-party components at its own cost "throughout 2022."

156. On January 21, 2022, Cowen Equity Research issued a report titled "PREANNOUNCES SOFT 4Q21 DUE TO RAIN; CONNECTOR REPLACEMENT FOR C&I COSTS ~$31MN" which reported, among other things "4Q21 EBITDA is now anticipated to come

in at the low end of the prior guidance of between $18mn and $41mn. Importantly, this does not include the $27mn supplier related charge."

157. On January 21, 2022, Bank of America issued a report titled "SunPower Corp. FY21 First Read: Miss on FY21 tgt. amidst weather, COVID, and quality setbacks" which stated in relevant part:

> **Product Recall / Quality Incident may cost $27mn more**
>
> Note that ***the adjusted results do not take into account the $27mn cost impact ($4mn additional in 1Q22) due to a supplier-quality issue faced by the Company***. The connectors used in the junction boxes by SPWR (not related to the MAXN solar panels or ENPH micro-inverters) were found to be defective and the Company intends to replace these connectors at the customer site. While the cost of the Component itself is not high (single-digit cent/W), SPWR expects to bear the installation/labor costs. . . . SPWR is pursuing a legal recourse to recoup these costs from the supplier . . . .

158. On January 21, 2022, Credit Suisse issued a report titled "SunPower Commercial Recall and Rainy California; Reduce TP by $1" which lowered the target price for SunPower and questioned whether the Company also needed to exit the CVAR commercial business in light of the cracked connectors problem:

> **Bottom line**: The company is weeks away from closing large commercial (CIS) sale, but ***we expect investors to question rationale to stay in small commercial (CVAR) amid recall charges***.

159. On January 21, 2022, Roth Capital Partners issued a report titled "SPWR: Downside Q4 Preannouncement" which explained that SunPower was replacing more than just "certain" connectors, but rather those found in "nearly all C&I systems since 2019," as follows:

> After market hours on 1/20, ***SPWR preannounced Q4'21 results to the downside*** and detailed the company's expectations for (1) charges of ~$31mn (~$27mn in Q4'21 and ~$4mn in Q1'22) ***related to the proactive replacement of third-party connectors experiencing a "cracking issue" for nearly all C&I systems since 2019***, and (2) adjusted EBITDA for Q4'21 to be at the low end of prior guidance ($18-41mn) due to the impacts of California weather and Covid. Maintain Neutral, PT to $19 from $26.
>
> **Overall thoughts**. Given the overall negative sentiment in the sector, look for the stock to be weak as SPWR expects ~$6.5mn of Q4'21 resi adjusted EBITDA to be pushed to Q1'22 due to California weather and Covid impacts. ***We believe SPWR may need to retrofit ~1,000+ sites representing close to ~9MW (our guesstimate)***.

160. On October 24, 2023, SunPower filed with the SEC on Form 8-K a release dated October 19, 2023 and titled "Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Reviews." The release revealed that "***a material weakness exists in the Company's internal control over financial reporting***," and that "the Company's ***disclosure controls*** and procedures and internal control over financial reporting were not effective." The release also announced the Company's intention to restate SunPower's financial reports going back to at least FY22 (starting January 4, 2022), but indicated that its review was not complete, resulting in investors believing that the true scope and magnitude of any problems discovered would be. As discussed below, the Company's false financial results extended back to FY20 as did its weakness in internal controls over financial reporting.

161. In response to this new, Company-specific news in the aftermarket on October 24, 2023, SunPower's stock price declined from a close of $4.96 on October 24, 2023, to $4.06 on October 25, 2023, an 18.1% drop, on more than 13.5 million shares trading volume as compared to only 5 million shares traded on October 24, 2023. However, the price of the Company's securities remained artificially inflated, including because the full impact of SunPower's cracking problem in its commercial business and Defendants' failures to properly reserve for corresponding warranty costs or maintain effective disclosure controls and internal controls over financial reporting had not yet been fully revealed.

162. On October 25, 2023, Morgan Stanley issued a report titled "Accounting Restatement – Here's What We Know," which reported: "The company also highlighted that it has not fully completed its review, which adds additional uncertainty ***and could result in additional or more material restatements***." Morgan Stanley continued that it saw "a high likelihood of ongoing valuation pressure until the market receives ***more clarity around the ultimate scope and impact of the restatement***."

163. Two months later, on December 18, 2023, SunPower filed with the SEC the Company's restated financial reports for the period FY20 through FY23, including filing on Form 10-K/A the restated financial report for FY22 that included restated financial results for FY20 and FY21. SunPower's December 18, 2023 10-K/A reported: (i) on the existence of a material

weakness in SunPower's internal controls over financial reporting; (ii) that its disclosures controls were not effective; (iii) that "[s]ubstantial doubt exists about our ability to continue as a going concern"; (iv) that the Company was still completing the repairing of "cracked connectors" disclosed on January 20, 2022; (v) that SunPower had taken a further $3.5 million charge related to the cracking problem for the second half of 2Q22; and (vi) that SunPower's previous financial results were falsely reported, including an overstatement of net income (loss) by $9.3 million for FY21.

164. In response to this new, Company-specific news on December 18, 2023, SunPower's stock price declined from a close of $6.14 on Friday December 15, 2023, to $4.22 on Monday December 18, 2023, a 21.2% drop, on more than 48 million shares trading volume as compared to only 13.1 million shares traded on December 15, 2023. However, the price of the Company's securities remained artificially inflated, including because the full impact of SunPower's cracking problem in its commercial business and Defendants' failures to properly reserve for corresponding warranty costs or maintain effective disclosure controls and internal controls over financial reporting, or to accurately report financial results during the Class Period, had not yet been fully revealed.

165. On April 23, 2024, SunPower filed with the SEC on Form 8-K a release that disclosed that the Company's restated financial filings, issued only four months prior, should no longer be relied upon, that the Company had discovered a new material weakness in the its internal controls over financial reporting, and that the Company was planning to issue a second restatement:

> The Company plans to restate, as soon as practicable, the Affected Prior Period Financial Statements.[19]
>
> * * *
>
> At this time, ***the Company has not fully completed its review, and the expected financial impact of the errors described above is preliminary and subject***

---

[19] The affected periods were for FY20 through FY23, to include all Class Period quarterly and annual financial reports (previously all restated as part of the 10-K/A for FY22, filed December 18, 2023).

> ***to change. The Company cannot provide assurance that other errors will not be identified***.
>
> * * *
>
> [T]he Company's management has concluded that a ***new material weakness*** exists in the Company's internal control over financial reporting. The Company's remediation plan with respect to such material weakness will be described in more detail in the Company's ***amended 2022 Form 10-K/A***.

166. In response to this new, Company-specific news on April 23, 2024, SunPower's stock price declined from a close of $2.14 on April 22, 2024, to $1.96 on April 23, 2024, a 9% drop, on more than 10.99 million shares trading volume as compared to only 3.34 million shares traded on April 22, 2024. However, the price of the Company's securities remained artificially inflated, including because the full impact of SunPower's cracking problem in its commercial business and Defendants' failures to properly reserve for corresponding warranty costs or maintain effective disclosure controls and internal controls over financial reporting, or to accurately report financial results during the Class Period, had not yet been fully revealed.

167. On April 23, 2024, Truist Securities issued a report titled "Challenges Continue to Mount on Add'l Accounting Issues & Resultant Planned Restatement." Truist reported that: "[M]gmt. has concluded that a new material weakness exists in its internal control over financial reporting. The associated remediation plan will be described in its amended 10K/A filing." *I.e.*, covering FY20-FY22.

168. On July 3, 2024, SunPower filed with the SEC on Form 8-K a release announcing that its auditor, EY, had resigned due to "***misconduct by senior members of management, who had significant roles in internal control over financial reporting***." EY further had indicated to SunPower that the senior management involved in misconduct are not current employees implicating Faricy and Sial.

169. The July 3, 2024, release also disclosed, for the first time, that the SEC had subpoenaed the Company in February and was apparently investigating "the Company's revenue recognition practices, with a focus on the periods covered by the Affected Financial Statements," which extended back to FY20 (*i.e.*, through and including the Class Period.

170. In response to this new, Company-specific news in the aftermarket on July 3, 2024 that EY was resigning, SunPower's stock price declined from a close of $2.68 on Wednesday July 3, 2024, to $2.08 on Friday July 5, 2024 (*i.e.*, the first trading day after the July 4 holiday), a 22.4% drop, on more than 19.5 million shares trading volume as compared to only 3.9 million shares traded on July 3, 2024. However, the price of the Company's securities remained artificially inflated, including because the full impact of SunPower's cracking problem in its commercial business and Defendants' failures to properly reserve for corresponding warranty costs or maintain effective disclosure controls and internal controls over financial reporting, or to accurately report financial results during the Class Period, had not yet been fully revealed.

171. On July 12, 2024, SunPower filed with the SEC on Form 8-K/A an amended notice attaching the EY response letter previewed in SunPower's July 3, 2024 Form 8-K. In the letter, EY disputed a number of SunPower's contentions from the July 3, 2024 Form 8-K. EY specifically indicated that SunPower, including its Audit Committee, had concealed allegations against prior management related to the restatement of earnings, and other issues related to the restatement. EY stated in relevant part:

> ***We disagree with the characterization of the disagreement as described by the registrant in the fifth and sixth paragraphs therein***. There was a disagreement between EY and the Company regarding audit scope, specifically regarding our expectation that we would be informed of ***allegations against current or former members of management who have or had significant roles in internal control over financial reporting and whose representations we rely upon, or previously had relied upon, in performing our audits***, even if those allegations did not expressly assert that there were errors in the Company's financial statements, and that the evaluation of such allegations was within the scope of our audit procedures. After we became aware that ***not all such matters had been disclosed to us, we communicated the need for the Company and its Audit Committee to disclose them to EY***, and we believed there was agreement on this point. However, the discovery of additional such allegations that had not been disclosed to EY indicated that a disagreement existed regarding our auditing scope or procedures.

172. In response to this new, Company-specific news in on July 12, 2024, SunPower's stock price declined from a close of $2.69 on Friday July 12, 2024, to $2.50 on Monday July 15, 2024, a 7% drop, on approximately the same number of shares traded as the prior trading day (6.9 million on July 15, 2024 slightly down from 7.2 million on July 12, 2024).

173. On July 15, 2024, TipRanks reported that a GLJ Research analyst reported that:

> SunPower on Friday issued one of the most "shockingly bad" regulatory disclosures the firm has seen. The filing provided additional information from [EY] regarding its resignation of auditor, with EY calling out new SunPower management for misrepresenting the reason it resigned. EY writes that SunPower continues to cover up various allegations against current and former management that impeded its ability to provide a clean audit of the Company's books.

174. On August 5, 2024, after market hours, SunPower filed for bankruptcy.

175. In response to this new, Company-specific news on August 5, 2024, SunPower's stock price declined from a close of $0.81 on August 5, 2024, to $0.45 on August 6, 2024, a 44% drop, on an astounding 89 million shares traded, up 82 million from the 7 million shares traded on August 5, 2024.

176. On August 6, 2024, *Bloomberg* published an article titled "Stumbles for Embattled Solar Company SunPower End in Bankruptcy." *Bloomberg* reported that "'SunPower's travails ***are emphatically a company-specific issue***. . . .'"

## X. ADDITIONAL ALLEGATIONS OF CONTROL PERSON LIABILITY

177. CEO Faricy and CFO Sial, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, releases, and other public statements pertaining to the Company during the Class Period. Defendants were provided with copies of the documents or scripts of statements alleged herein to be misleading prior to or shortly after issuance, and/or had the ability and/or opportunity to prevent issuance of those statements, or cause them to be corrected. Defendants participated in SunPower's earnings calls and also signed the various SEC filings issued during the Class Period, including quarterly reports on Form 10-K and SOx Certifications attached thereto asserting, *inter alia*, that each had "[e]valuated the effectiveness of the registrant's disclosure controls." As detailed herein Faricy and Sial were responsible for designing and ensuring the effectiveness of SunPower's controls and, as a management the projections used recording contingent liabilities for the warranty reserves during the Class Period.

178. SunPower's Corporate Governance Principles also provided that "[t]he day-to-day business of the Company is carried out by its employees, managers and officers, under the direction of the CEO and the oversight of the Board." And the Company's annual reports filed on Form 10-

K with the SEC, including the annual report for FY21 filed with the SEC on February 25, 2022, reported that: "Our chief executive officer, as the chief operating decision maker ("CODM"), reviews our business, manages resource allocations and measures performance of our activities between the RLC, C&I Solutions, and Other segments." Accordingly, Defendants are responsible for the accuracy of the public reports, statements, and releases detailed herein.

179. In addition, the Total Defendants controlled SunPower, its board, and its executives, including Faricy and Sial and other employees. At all relevant times, each Total Defendant was a beneficial majority owner of SunPower. In 2011, TotalEnergies, through its fully controlled subsidiaries, acquired a majority interest in SunPower for approximately $1.4 billion, acquiring 60% of the Company's then outstanding shares. As of January 2021, the Total Defendants each beneficially owned approximately 51% of the Company's outstanding stock.

180. SunPower's "Affiliation Agreement" and its subsequent amendments with TE Solar and TE Gaz included a number of provisions for the Total Defendants to maintain and exercise control. First, TE Solar held the power to appoint a majority of SunPower's board of directors, equal to 6 of 11 members during the Class Period. TE Solar also held the power to appoint 2 of 4 members in each of the Compensation Committee and the Nominating and Corporate Governance Committees of the board.

181. The TE Solar-designated SunPower board members during the Class Period were all long-time, senior employees of TotalEnergies or TotalEnergies subsidiaries, and many directors also held board positions at other TotalEnergies subsidiaries, including as follows: (i) Julien Pouget ("Pouget") was also a TotalEnergies senior vice president; (ii) Bernadette Baudier was also a TotalEnergies senior vice president, finance, before that holding various TotalEnergies positions since 2016; (iii) Denis Toulouse was TotalEnergies senior vice president of corporate & project finance since 2019, previously serving as TotalEnergies senior vice president, mergers & acquisitions since 2015, and working at other TotalEnergies controlled entities beginning in 2000; (iv) Frank Trochet was vice president, finance of Total Petrochemicals and Refining USA, Inc. in Houston since 2017, before that holding a variety of positions at TotalEnergies and its subsidiaries starting in 2000; (v) Laurent Wolffsheim was TotalEnergies SE senior vice president, strategy

growth & people within the Gas Renewables and Power division since January 2021, working at other TotalEnergies subsidiaries since 1995; (vi) Nathalie Portes-Laville was TotalEnergies' vice president in corporate and project finance, holding various other positions with TotalEnergies over the previous 15 years, and before that as chief financial officer of TotalEnergies Marketing Puerto Rico; (vii) Vincent Stoquart was TotalEnergies senior vice president since December 6, 2021, before that holding positions at various TotalEnergies subsidiaries beginning in 1998; and (viii) Francois Badoual was employed by TotalEnergies subsidiaries since 1990.

182. The Affiliation Agreement between SunPower, TE Solar, and TE Gaz outlined other methods of control, including the right to "purchase a portion of [] new securities equal to its percentage ownership in us" in order to maintain the same level of control. Pursuant to the affiliation agreement, TotalEnergies also held veto power over any sales by SunPower worth over 10% of its assets.

183. In December 2020, TE Solar and SunPower entered into a Strategic Cooperation Framework Agreement ("Cooperation Agreement") to remain in effect until December 31 2023, described in SunPower's FY21 annual report filed on Form 10-K. The Cooperation Agreement gave the Total Defendants further control over SunPower's decision making concerning the "development and sale of certain future commercial solar power projects."

184. The sale of SunPower's CIS business to TotalEnergies, according to internal documents quoted in the TotalEnergies Complaint, illustrates how these various factors gave TotalEnergies control over the Company. Throughout the course of SunPower's sale of its CIS business to SunPower, TE Solar board designee Pouget acted as an intermediary to convey TotalEnergies's positions to the rest of the board and SunPower executives, including Faricy. During the process, Pouget repeatedly invoked TotalEnergies's veto power. In one instance, he reminded the board that one of the "key principles that should underlie any marketing process for the CIS Business" must be the "desire to maintain a positive working relationship with Total given its position as an important stockholder and its right . . . to approve or disapprove any sale of the CIS Business pursuant to the Affiliation Agreement."

## XI. NO SAFE HARBOR

185. SunPower's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

186. The Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of SunPower who knew that the FLS was false. None of the historic or present tense statements, or historic or present tense portions of "mixed" statements, made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## XII. APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

187. Plaintiff will rely upon the presumption of reliance established by the fraud-on the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiff and other members of the Class purchased SunPower securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

188. At all relevant times, the market for SunPower securities was efficient for the following reasons, among others:

(a) as a regulated issuer, SunPower filed periodic public reports with the SEC; and

(b) SunPower regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

189. Plaintiff will also rely upon the presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## XIII. CLASS ACTION ALLEGATIONS

190. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired SunPower publicly traded securities during the Class Period (the "Class"). Excluded from the Class are Defendants and Total Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

191. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, there were more than 170 million outstanding shares almost certainly owned by thousands, if not tens of thousands, of persons.

192. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) whether the Exchange Act was violated by Defendants;

(b) whether Defendants omitted and/or misrepresented material facts;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e) whether the prices of SunPower publicly traded securities were artificially inflated; and

(f) the extent of damage sustained by Class members and the appropriate measure of damages.

193. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

194. Plaintiff will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

195. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against Faricy, Sial, and SunPower

196. Plaintiff incorporates ¶¶1-195 by reference.

197. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

198. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of SunPower securities during the Class Period.

199. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SunPower securities. Plaintiff and the Class would not have purchased SunPower securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**

**For Violation of §20(a) of the Exchange Act Against Faricy, Sial, SunPower, and the Total Defendants**

200. Plaintiff incorporates ¶¶1-199 by reference.

201. The Defendants and the Total Defendants acted as controlling persons of SunPower within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of SunPower securities, the Defendants had the power and authority to cause SunPower to engage in the wrongful conduct complained of herein. SunPower controlled the Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act. The Total Defendants acted as control persons of SunPower, its board of directors, its executives (including Faricy and Sial), and its employees within the meaning of §20(a) of the Exchange Act. By reason of their majority ownership of the company, their rights to appoint a majority of SunPower's board, and other provisions of the Affiliated Agreement with the Company, the Total Defendants had the power and authority to cause Defendants to engage in the wrongful conduct complained of herein. The Total Defendants controlled Faricy and Sial (as well as SunPower, its board of directors, and all of its employees). By reason of such conduct, the Total Defendants are liable pursuant to §20(a) of the Exchange Act.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, having designated Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against Faricy, Sial, SunPower, and the Total Defendants, jointly and severally, for all damages sustained as a result of the wrongdoing alleged herein, in an amount to be proven at trial, including interest thereon;

C. Awarding compensatory damages in favor of Plaintiff and the other Class members against Faricy, Sial, SunPower, and the Total Defendants, jointly and severally, for all damages sustained as a result of the wrongdoing alleged herein, in an amount to be proven at trial, including interest thereon;

D. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## XV. JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 21, 2024

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
KENNETH J. BLACK
SNEHEE KHANDESHI

s/ Kenneth J. Black
KENNETH J. BLACK

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com
skhandeshi@rgrdlaw.com

Lead Counsel for Lead Plaintiff